HEARD APRIL TERM, 1879.

CASE No. 760.

G. M. WALKER, CASHIER, v. THE STATE OF SOUTH CAROLINA.

F. J. PELZER v. THE SAME.

EDWARD SEBRING v. THE SAME.

THE BANK OF CHARLESTON N. B. A. v. THE SAME.

THE W. L. I. CHARITABLE ASSOCIATION v. THE SAME.

F. J. HERRON v. THE SAME.

1. The Court of Claims constituted under Joint Resolution No. 99, of March 22d, 1878, was not limited to an investigation of the inquiry whether the bonds surrendered in exchange for consolidation bonds were issued in accordance with the provisions of the statutes authorizing their issue, but it was empowered and directed to inquire into the validity of certain specified bonds and stocks issued under the authority of the consolidation act, and whether they were obligations binding upon the state.
2. The constitution of 1868 has been, since its adoption, the fundamental law of this state, and the acts of assembly passed in pursuance thereof, have as full force and validity as any laws upon the statute book.
3. The legal principles applicable to an action upon negotiable bonds apply, in like manner, to actions upon the coupons of such bonds.
4. Coupon bonds are, to all intents, negotiable securities.
5. States issuing negotiable securities incur the same responsibilities which attach to individuals and corporations in like case.

6. The holder of state bonds and coupons is presumed, in the absence of proof to the contrary, to have taken them under-due for a valuable consideration, and without notice of any objection to which they were liable.

7. Bonds issued by a state through its duly authorized officers under the authority of its laws, professing upon their face that the conditions imposed by the statute authorizing their issue have been complied with, are valid obligations of the state in the hands of *bona fide* purchasers, although such conditions were not complied with, or although in their issue gross frauds were perpetrated by the agents of the state. *Cases considered.*

8. To be a valid obligation of the state the bond must be issued under the authority of a statute which is free from constitutional objections.

9. No debt could be created by the consolidation act, (15 *Stat.* 518), as it was not passed by two-thirds of both branches of the general assembly, nor submitted to a vote of the people.

10. Under an act entitled "An act to authorize a state loan to pay interest on the public debt," approved August 26th, 1868, the governor was authorized to borrow, on the credit of the state, on coupon bonds, within twelve months from its passage, "a sum not exceeding one million dollars, or so much thereof as he may deem necessary to pay interest on the public debt." *Held,* that the governor was not restricted by the act to the issue of $1,000,000 in bonds, but to the issue of such an amount of bonds as would realize $1,000,000 in money.

11. *Held further,* that after there had been one issue of bonds under this act of the legislature, there was no authority for another and subsequent issue under the same act.

12. Under an act of the general assembly, approved August 26th, 1868, (14 *Stat.* 17), the governor was authorized to borrow, on the credit of the state, on coupon bonds, within twelve months from its passage, a sum not exceeding $500,000, or as much thereof as he may deem necessary, to redeem the bills receivable of the State of South Carolina; and it was provided "that an annual tax in addition to all other taxes shall be levied upon the property of the state, sufficient to pay the interest on the loan hereinbefore authorized." *Held,* that the debt thereby created was for an extraordinary expenditure of the state government within the meaning of the constitution.

13. In Section 7, Article IX., of the constitution—"for the purpose of defraying extraordinary expenditures, the state may contract public debts"— the word "extraordinary" is used in contra-distinction to the word "ordinary," or annual expenses of the state government, which includes current interest on the public debt. *Per* McIver, A. J. Willard, C. J., concurring, holds further, that annual expenses, may under certain exigencies, assume the character of extraordinary expenditures. Haskell, A. J., holds, that "extraordinary" means everything that is not "ordinary," as defined in the constitution.

14. The state was authorized in 1868, under the new constitution, to borrow

money on coupon bonds to pay past-due interest and floating indebtedness existing at that time.

15. This act providing for a loan to redeem bills receivable complied with the requirement of Section 7, Article IX., of the constitution, that "every such law shall levy a tax annually, sufficient to pay the annual interest of such debt," there being then upon the statute book a general act regulating an annual assessment and collection of taxes. *Morton, Bliss & Co.* v. *Comptroller-General,* 4 *S. C.* 430.

16. A contract valid under the laws of the state as expounded at the date of the contract, cannot be affected by any subsequent decision of the courts altering the construction of such laws.

17. A decision of this court upon a constitutional question not only affects the case before the court, but stands as an authoritative construction of the clause of the constitution thereby interpreted, and is conclusive upon other cases involving the same question.

18. Bonds of the state issued in payment of outstanding bills receivable for which the state had received value, are valid and binding obligations, even though such bills should be considered bills of credit. The constitution of the United States does not prohibit a state from *paying* bills of credit.

19. The provision in Section 7, Article IX., of the state constitution, that no law creating a public debt "shall take effect until it shall have been passed by the vote of two-thirds of the members of the general assembly," &c., means two-thirds of the members present, a quorum voting. *Morton, Bliss & Co.* v. *Comptroller-General,* 4 *S. C.* 430; *County of Cass* v. *Johnston,* 95 *U. S.* 360.

20. Bills of the Bank of the State of South Carolina—a corporation created by the state, and of which it was the only stockholder—issued under the express authority of the state for its sole benefit, and to the payment of which the faith of the state was pledged, are "evidences of indebtedness" within the meaning of the provision in Section 10, Article IX., of the constitution, that "no scrip  *  *  *  shall be issued except for the redemption of stock, bonds, or other evidences of indebtedness previously issued." And bonds issued in exchange for such bank bills do not create a new debt.

21. "An act to authorize a loan for the relief of the treasury," approved February 17th, 1869, which provides that money not exceeding a specified sum may be borrowed "for the relief of the treasury of the state," violates the constitutional limitation, Section 7, Article IX., that "for the purpose of defraying extraordinary expenditures, the state may contract public debts; but such debts shall be authorized by law for some single object, to be distinctly specified therein." (1.) In that it purports to create a debt which was not for the purpose of defraying extraordinary expenditures; and (2.) In that the debt is not authorized for some single object distinctly specified therein. And bonds resting upon the authority of that act, and all consolidation bonds issued in exchange for such bonds, are not valid debts of the state. HASKELL, A. J., *dissenting.*

22. An act entitled "An act to provide for the appointment of a land commissioner and to define his powers and duties," and which provides for the appointment of a land commissioner, defines his duties and authorizes the issue of bonds for the purpose of raising money with which to purchase lands, to be re-sold again on credit to citizens, is in compliance with Section 20, Article II., of the constitution, which requires that "every act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." *Morton, Bliss & Co.* v. *Comptroller-General*, 4 S. C. 430; *Antonio* v. *Mehaffy*, 96 U. S. 312.

23. The constitution providing in Section 7, Article IX., that no law creating a public debt "shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the general assembly, to be recorded by yeas and nays on the journals of each house respectively," no such law would be valid unless a record of a two-thirds vote by yeas and nays affirmatively appeared upon the journals of both houses.

24. But where it appears upon the journals of the house of representatives that the bill did not receive such vote on its third reading in that body, but did upon its final passage by the house after its return from the senate with amendments, the house journal shows a substantial compliance with the constitutional requirement.

25. An act permitting the exchange or conversion of outstanding bonds and stocks into new bonds, authorizes no new debt, and such conversion bonds issued not in exchange for outstanding obligations, were issued without authority of law, and are void even in the hands of a *bona fide* holder.

26. Whether a state debt shall be contracted by sale of its bonds, or by their deposit as collateral security for its loan, are not prescribed in the constitution, and are therefore left to the discretion of the legislature.

27. The registration of bonds required by the constitution, Section 14, Article IX., to be kept by the state treasurer, is not a condition precedent to their issue, but a direction of duty upon the state treasurer.

28. The state having issued new or consolidation bonds in exchange for outstanding bonds and stocks, at the rate of fifty cents on the dollar, the burden of proof is upon the state in every case to show that the consolidation bonds in question rest upon invalid vouchers.

29. The consolidation act, which authorized the issue of new bonds, at the rate of fifty cents on the dollar, for outstanding bonds and stocks specified by class and amounts, to such persons as would accept the exchange, did not purport to impart validity to securities invalid under the constitution, nor was it a composition by the state with its creditors. *Per* WILLARD, C. J.

Before COURT OF CLAIMS, May, 1879.

In the constitution adopted for South Carolina in 1868, under the authority of the acts of congress generally called the reconstruction acts, the following provisions occur:

Article II., Section 14.   *   *   *   A majority of each house shall constitute a quorum to do business.   *   *   *

Article II., Section 20. Every act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title.

Article II., Section 26. Each house shall keep a journal of its own proceedings, and cause the same to be published immediately after its adjournment, excepting such parts as, in its judgment, may require secrecy, &c.

Article IX., Section 3. The general assembly shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever it shall happen that such ordinary expenses of the state for any year shall exceed the income of the state for such year, the general assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of the ensuing year.

Section 4. No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object such tax shall be applied.

Section 7. For the purpose of defraying extraordinary expenditures, the state may contract public debts; but such debts shall be authorized by law for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the general assembly, to be recorded by yeas and nays on the journals of each house respectively; and every such law shall levy a tax annually, sufficient to pay the annual interest of such debt.

Section 10. No scrip, certificate, or other evidence of state indebtedness, shall be issued except for the redemption of stock, bonds, or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in this constitution.

Section 14. Any debt contracted by the state shall be by loan on state bonds of amounts not less than fifty dollars each, on interest payable within twenty years after the final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the treasurer in numerical order, so as

always to exhibit the number and amount unpaid, and to whom severally made payable.

No question is made, in any of these cases, as to the validity of any of the bonds or stocks of the state issued prior to 1868; their validity is conceded.

The first act authorizing a public debt passed by the government instituted under this new constitution of 1868, was approved August 26th, 1868, and is entitled "An act to authorize a loan to redeem the obligations known as the Bills Receivable of the State of South Carolina." 14 *Stat. at L.* 17. It authorized the governor to borrow, on the credit of the State of South Carolina, on coupon bonds, within twelve months from the passage of this act, a sum not exceeding $500,000, or as much thereof as he may deem necessary to redeem the bills receivable of the State of South Carolina; and that an annual tax, in addition to all other taxes, shall be levied upon the property of the state, sufficient to pay the interest on the loan hereinbefore authorized, at the times when such interest shall fall due. These bills receivable were issued under the authority of an act of the legislature of December 21st, 1865, and were receivable for all taxes due the state. This act was passed in both houses, by a two-thirds vote of the members present in each, a quorum voting, but not by a two-thirds vote of the entire number of members qualified.

On the same day was passed another act, (14 *Stat.* 18), entitled "An act to authorize a state loan to pay interest on the public debt." It authorized the governor to borrow on the credit of the state, &c., "a sum not exceeding $1,000,000, or as much thereof as he may deem necessary to pay interest on the public debt;" and it contained the same provision as to the annual tax as the act to redeem bills receivable.

The next act in date was ratified September 15th, 1868, and is entitled "An act to close the operations of the Bank of the State of South Carolina." It provided, among other things, for the issue of bonds in payment and redemption of bills of the bank of the state, but made no provision for an annual tax levy. The character of these bank bills is sufficiently stated in the

opinion of the court. They have been repeatedly recognized as debts binding upon this state.

Next follows "An act to authorize a loan for the relief of the treasury," approved February 17th, 1869. 14 *Stat.* 182. It authorized the governor to borrow, within twelve months from its passage, a sum not exceeding $1,000,000, or as much thereof as may be deemed necessary, for the relief of the treasury of the state." The loan was to be effected by a deposit of the bonds herein authorized, as collateral security for loans by the financial agent of the state, in the city of New York, in accordance with the directions of the governor, attorney-general, comptroller-general and treasurer, or by the sale of said bonds at the highest market price, but not less than for a sum to be fixed by them. And an annual tax levy was provided in the same terms as in the act to redeem bills receivable.

The conversion act, entitled "An act to provide for the conversion of state securities," approved March 23d, 1869, (14 *Stat.* 241), simply authorized the issue of coupon bonds in exchange for outstanding state stock, and of state stock in exchange for outstanding coupon bonds. None of the special provisions required by the constitution in cases of the creation of a public debt, were complied with.

Next followed "An act to authorize the financial agent of the State of South Carolina, in the city of New York, to pledge state bonds as collateral security and for other purposes," approved March 26th, 1869. 14 *Stat.* 258. It authorized the financial agent of the state in New York, to pledge bonds of the state, then or hereafter in the possession of the state as collateral security for state loans; and the time within which the loans authorized under the act to redeem bills receivable, and under the act to pay interest on the public debt, might be negotiated, was extended twenty-four months from the passage of those acts.

"An act to provide for the appointment of a land commissioner, and to define his powers and duties," was approved March 27th, 1869. 14 *Stat.* 275. Section 5 provided: " The treasurer of the state is hereby authorized and directed to issue to the land commissioner bonds of this state in the sum of $200,000, with coupons attached, if, in the opinion of the said advisory board, so

much be necessary, bearing six per cent interest. * * * The faith and credit of the state is hereby pledged to the payment of the principal and interest of said bonds, and a sufficient amount of taxes is hereby levied to pay the interest accruing on said bonds annually." The manner in which the necessary record of yeas and nays on the passage of this bill by the house was made, is stated in the opinion of the court. A further issue of $500,000 in bonds was authorized under an amendatory act of March 1st, 1870, (14 *Stat.* 385), in the same terms as Section 5, above re-cited.

On December 18th, 1869, an act was passed authorizing interest on all outstanding bonds and stocks (except those issued in aid of the rebellion) to be paid in coin. 14 *Stat.* 303. On March 1st, 1870, an act entitled "An act to provide for a sink-ing fund and the management of the same," appointed certain officers a commission with power to sell any real or personal property of the state, not in actual use or held in trust, the pro-ceeds to constitute a sinking fund, to be invested in the purchase of state securities. 14 *Stat.* 388.

Several objections were urged in the answers and proven, against the validity of several of the bonds issued under the authority of these acts of the legislature. No correct registry of these bonds, by number and amount, was kept by the state treas-urer. The only registration made was that the financial agent of the state in New York had so many bonds, numbers of which, in the gross, were accurately kept.

Loans were effected in New York upon a hypothecation of bonds of the several classes, very many of which were pledged after September 21st, 1871. These hypothecated bonds included bonds under all of the above-recited acts, and also bonds pur-chased under the sinking fund act, and bonds in which were invested the proceeds of the sale of agricultural land scrip, issued to the state by the United States government, in trust for an agricultural college.

In September, 1868, $1,000,000 in bonds were issued under the authority of the act of August 26th, 1868, and were desig-nated upon their face as "loan to pay interest on the public debt." In the summer and fall of 1869 a second $1,000,000 in

bonds were issued under the authority of this same act, and were designated as "issued under act approved August 26th, 1868." R. K. Scott, governor of the state at that time, testified: "It was not my intention that more than $1,000,000 of these should be out, but the whole $2,000,000 did go out and did become a part of the public debt; $500,000 of them were returned, and I destroyed them in the presence of Mr. Parker, D. H. Chamberlain, Dr. Neagle and others; the $500,000 had been replaced by conversion bonds." It also appeared in evidence that $50,000 were subsequently destroyed.

It also appeared that the limits in amount fixed in the acts to pay interest on public debt, to redeem bills receivable, and for relief of the treasury, were larger than the outstanding demands provided for required. The first and second issue of bonds to pay interest on the public debt, amounted to $2,000,000, of which $550,000 being retired and canceled, left outstanding $1,450,000. Under the act to redeem bills receivable, $500,000 were issued. Under the act for the relief of the treasury, $1,-000,000 in bonds were issued. Under the two land commission acts, $700,000 were issued. Under the coversion act, $5,965,-000 were sold, or used as collateral security for loans, and not issued in exchange for surrendered securities. Other conversion bonds were properly issued in exchange for outstanding securities.

An act entitled "An act relating to the bonds of the State of South Carolina," generally called the validating act, was approved March 13th, 1872. 15 *Stat.* 278. It recited: "Whereas, bonds or obligations of this state have been issued from time to time to a large amount, in accordance, as was supposed by the officers issuing the same, with the authority and provisions of certain acts of the general assembly, including—[here followed an enumeration of all the above-recited acts;] which said bonds are fully and particularly stated and set forth in a report made by the treasurer of this state to the general assembly, dated October 31st, 1871; and whereas, doubts have arisen whether said issues were in strict conformity to the provisions of the said several acts under which they were respectively issued; and whereas, it was the true intent and meaning of the several acts

above set forth, that such issues of bonds or obligations should be made in the manner in which the same have been made, as aforesaid; and whereas, also, doubts have been raised as to the validity of some of the bonds mentioned in the said annual report of the state treasurer for the fiscal year ending with October 31st, 1871, although money has been borrowed by, or realized out of, said bonds, on account of this state; and whereas, the credit of this state has been affected thereby:

"SECTION 1. Be it enacted, &c., That the said bonds and obligations issued on behalf of this state, as mentioned and set forth in the report of the treasurer of this state to the general assembly, dated October 31st, 1871, were duly and lawfully issued, in conformity with the true intent and meaning of the several acts of the general assembly hereinbefore set forth by their respective titles.

"SEC. 2. That the acts of the officers of this state, authorized under the provisions of the laws of this state and of the several acts hereinbefore referred to, to the extent of all issues of bonds or obligations enumerated and set forth in the said report of the treasurer, be and are hereby in all things ratified, confirmed and established.

"SEC. 3. That each and all of the bonds named in said annual report, &c., be, and the same are hereby declared to be, legal and valid bonds of the State of South Carolina, for the payment of which the faith, credit and funds of the state have been and are hereby pledged; *provided*, that no bonds be included which are not registered in the treasury at the time of the passage of this act, as provided for by Section 14 of Article IX. of the constitution, relating to finance and taxation.

\* \* \* \* \* \*

"SEC. 7. That neither the sum or sums realized from any sale or sales of any of the bonds of this state, nor the manner of sale of any of the bonds of this state, shall in any manner affect or impair the validity and obligation thereof."

The other sections of this act need not be copied here. The act was not passed by a two-thirds vote.

The report of the state treasurer, dated October 31st, 1871,

O

referred to in the validating act, sets out the debt of the state under the above-recited acts as follows:

Under act of August 26th, 1868................................ $500,000
"      August 26th, 1868............................ 1,250,000
"      September 15th, 1868........................ 1,189,400
"      February 17th, 1869......................... 899,000
"      March 23d, 1869.............................. 7,255,700
"      March 27th, 1869.............................. 200,000
"      March 1st, 1870.............................. 500,000

After the date of this report, and before the passage of the consolidation act below mentioned, several of these bonds were exchanged for conversion bonds under the act of March 23d, 1869.

The irregularities, illegalities and frauds connected with the issue of state bonds from 1868 down to the close of 1871, were fully set forth in a report made to the general assembly by a joint committee of the two houses in December, 1871.

The following additional article was duly ratified, and became a part of the constitution, on January 29th, 1873:

"ARTICLE XVI.—To the end that the public debt of South Carolina may not hereafter be increased without the due consideration and free consent of the people of the state, the general assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the state by guaranty, endorsement or otherwise, except for the ordinary and current business of the state, without first submitting the question as to the creation of any such new debt, guaranty, endorsement or loan of its credit to the people of this state at a general state election; and unless two-thirds of the qualified voters of this state, voting on the question, shall be in favor of a further debt, guaranty, endorsement or loan of its credit, none shall be created or made."

Such is the financial legislation of the state under the reconstruction government of the state down to the compromise measure of December 22d, 1873, generally called the consolidation act. It was as follows:

"An act to reduce the volume of the public debt and provide for the payment of the same.

"SECTION 1. Be it enacted, &c., That the state treasurer is hereby authorized . and required to receive from the holders willing to surrender the same—[here follows a statement of the amounts outstanding, with the date and title of the acts under which issued, which is omitted, so far as it recites the debt contracted prior to August, 1868, after which, reduced to figures, it continues]—the certificates of stock issued under act of March 23d, 1869, redeemable in 1888, amounting to $64,000; the bonds of the state issued under the act of August 26th, 1868, amounting to $1,197,000; the bonds issued under the act of August 26th, 1868, amounting to $484,000; the bonds issued under the act of September 15th, 1868, amounting to $1,189,600; the bonds issued under the act of February 17th, 1869, amounting to $856,000; the bonds issued under the act of March 27th, 1869, amounting to $124,000; the bonds issued under the act of March 1st, 1870, amounting to $343,000; the bonds issued under the act of March 23d, 1869, redeemable in 1888, for the purpose of exchange of any of the certificates of stock or bonds above enumerated, said fact being ascertainable from the treasurer's registry of bonds and stocks converted, amounting to $1,577,500; and shall thereupon, in exchange for and in lieu of said bonds and stocks so surrendered, issue to said holders other coupon bonds or certificates of stock as they may desire, equal in amount to fifty per centum of the face value of the bonds or certificates of stock so surrendered, and that the bonds known as conversion bonds, amounting to $5,965,000, and which were put upon the market without any authority of law, be and the same are hereby declared to be absolutely null and void."

Section 2 provided for a like surrender of coupons, and the remaining sections of the act pledged the faith of the state to the payment of these consolidation bonds, declared that an annual levy of two mills should be made to pay the interest, which declaration should be considered as a part of the contract, and regulated the issue, registration, and so forth.

Soon after the passage of this act the consolidation of the existing debt of the state commenced, most of the creditors accepting its terms and receiving new or consolidation bonds in lieu of the securities surrendered by them to the state treasurer.

Many of the consolidation bonds questioned in these proceedings were issued in exchange for detached coupons, which it was alleged were not due by the state: (1) such as were detached from bonds which were never issued; (2) such as matured prior to the issue of the bonds to which they belonged; (3) such as matured at a time when the state treasurer's report showed that interest had been paid; (4) such as were cut off by the financial agent from bonds passing through his hands and fraudulently issued.

In April, 1877, the government of South Carolina passed under the control of a political party opposed to that which had controlled the state for the nine preceding years.   The legislation which was had, looking to an investigation and determination of the bonded debt of the state, the organization of the special Court of Claims, with its powers and duties, and the submission by the state to its jurisdiction, and the character of these proceedings, are fully set out in the opinion of the court.

In March, 1878, the general assembly, on joint ballot, elected the Hon. A. P. Aldrich, judge of the second circuit, Hon. Thomas Thomson, judge of the eighth circuit; and Hon. J. H. Hudson, judge of the fourth circuit, members of the Court of Claims. At their first meeting Judge Aldrich was elected president of the court.

Hon. Henry Meetze, of Lexington, and Hon. Y. J. Pope, of Newberry, were elected by the general assembly associate counsel, who, together with the attorney-general, represented the state in the proceedings.

The judges of the Court of Claims filed each an opinion. Omitting such statements of facts as are above stated, and extracts from authorities, they are as follows:

THOMSON, J.   Suits were brought in the above case and others on coupons of bonds consolidated under the act of assembly, A. D. 1873, alleging they were not paid according to their obligation.

Answers were filed in all the cases, containing numerous grounds of defence.

In a number of the cases, "the defences, however, were

nominal." The plaintiffs proved their ownership of the bonds and traced from the bonds their ownership of the "canceled bonds, coupons and certificates of stock" which had been in their possession or in those from whom they derived their right. In such cases judgments were given for the plaintiffs.

But defences were made to bonds by far the largest in number and amount, alleging they were obnoxious to one or more of the charges of illegality contained in the specifications of *Schedule No.* 6 of the bond commission's report.

The case above stated, and more, were issued upon coupons of bonds regarded as subject to the objections made by the bond commission, and trial was had of them as test cases.

The pleadings—testimony taken in New York—parol testimony and numerous documents, with arguments of counsel, were submitted to the court in said cases.

It may be proper to state briefly the legislation which established the Court of Claims and brought these cases before it. By a joint resolution, passed on March 21st, A. D. 1878, the legislature provided a mode of ascertaining the debt of the state, and of liquidating and settling the same. *A. A.* 1877, *p.* 669.

This joint resolution was, it seems, the result of a prolonged discussion in the legislature upon the report of a commission appointed to investigate the indebtedness of the state under a joint resolution approved June 8th, A. D. 1877. *A. A.* 1877, *p.* 318.

This commission was raised to make a complete and thorough investigation of certain matters, amongst them, "whether there is in the state treasurer's office on file, as vouchers, canceled bonds, coupons, and certificates of stocks of the issues described, issued in accordance with law and authorized to be consolidated by the act above recited to the amount required by said act, and with power to the commission, should it appear in the course of the investigation that any of said bonds, certificates of stock or coupons have been illegally or otherwise improperly issued, to report the same, together with the evidence upon which the illegality or non-conformity to law rests."

Acting under said authority, the commission made their report, and found that $5,184,062 of bonds were issued in accordance

with law, and authorized to be consolidated under the act of
A. D. 1873.

They further reported there were vouchers remaining in the
judgment of the commission not issued in accordance with law,
and authorized to be consolidated, amounting to $3,608,717.

The controversy was in relation to *the vouchers for* $3,608,717,
called in the joint resolution of June, A. D. 1877, " canceled
bonds, coupons and certificates of stock;" whether these were
issued in accordance with law, and authorized to be consolidated.

The vouchers—" canceled bonds, coupons and certificates of
stock "—objected to in the report of the bond commission, are
fully set forth therein. *Schedule No.* 6 appended to the report,
describes with minuteness the securities issued as alleged not in
accordance with law.

The question as to the *validity of these vouchers* was submitted
to the Court of Claims, according to the resolution set forth
below.

It is obvious that an important and primary inquiry is, what
is the power of this court? or what is the duty required by the
legislature at its hands?

The Court of Claims is special in character and possesses the
powers of a Circuit Court only in relation to the subjects desig-
nated in the resolution and submitted to it. The powers of the
court are defined by the enactments creating it, and outside of
which it has no authority to act. These powers cannot be ex-
tended by implication, nor can the court assume constructive
powers—" powers not literally given or necessarily consequent
upon those so given." *McKinzie* v. *Ramsay,* 1 *Bail.* 457.

And inasmuch as the court exists only by legislative author-
ity, reference must be had thereto to ascertain both the extent of
power and the objects to be accomplished.

The resolution provides (first section) that said court shall
" have jurisdiction to hear and determine any case or cases made
up or brought to test the validity of any of the consolidated
bonds, coupons and certificates of stock, or any of the various
classes of them, mentioned in the said report of the bond com-
mission *as resting* on vouchers not issued in accordance with law,
and authorized to be consolidated by the act of the general

assembly, approved December 22d, 1873, entitled "An act to reduce the volume of the public debt, and provide for the payment of the same;" and also as not issued in accordance with law, and further designated in *Schedule* 6 of the said report."

That which is plain needs no interpretation. The validity of the consolidation bonds, coupons and certificates of stock, or any of them, *as resting* on vouchers not issued in accordance with law and authorized to be consolidated by the act of assembly of A. D. 1873, is to be tested.

At the close of the same section, as if to place the intent beyond doubt, are added the words: "And also as not issued [that is, the canceled bonds, coupons and certificates of stock] in accordance with law, and further designated and described in *Schedule* 6 of the said report," viz., the report of the bond commission.

Upon a reference to the report, 9th page, the following language is found: "The remaining $3,608,717 of these vouchers, in the judgment of the commission, were not issued in accordance with law and authorized to be consolidated by the act above recited." Then follows an enumeration of the evidences of public indebtedness, called by the bond commission "vouchers," applied to eleven classes of securities. Can there be a doubt that the vouchers referred to in the resolution are the securities called vouchers in the report?

With equal clearness the meaning of the legislature may be learned from Section 9 of the resolution, which declares that a case or cases are to be heard and determined in said court "to test the validity of the said consolidation bonds and coupons and certificates of stock mentioned in *Schedule* 6, *bringing before the court the various classes of vouchers which, it is alleged in the report of the said commission, impair* the validity of the said consolidated bonds, coupons and certificates of stock, or any of them."

What is the meaning in the largest sense which, according to the common use of language, is to be given to the sections of the said resolution? They ought not to be extended *beyond* their ordinary sense in order to comprehend a case within their object; for that would be to give effect to an intention not expressed. *Broom Leg. Max.* 276.

When the jurisdiction is sharply defined and in so many words, what place can there be for the exercise of constructive powers? In regard to the grant of power here expressed, the rule that the express mention of one thing implies the exclusion of another, may fitly apply. *Broom Leg. Max.* 278.

In connection with the consolidated bonds, the only matters mentioned are the vouchers.

The question is not whether the consolidated bonds, coupons and certificates of stock are valid, but whether they are valid as issued in accordance with law, and authorized to be consolidated by the act of the general assembly, or as stated in the ninth section of the resolution, "to test the validity of the said consolidated bonds, coupons and certificates of stock, *bringing before the court the various classes of vouchers* which, it is alleged, impair the validity of the bonds, coupons and certificates of stock."

For the Court of Claims to hold that the act of A. D. 1873 is conclusive, by compromise or otherwise, of the validity of the bonds, coupons and certificates of stock, because the securities to be consolidated are enumerated in the first section of the act, is an end of the case.

Such a question could be made before a court of general jurisdiction. This question is not submitted by the resolution to the Court of Claims, nor does it touch the point presented by the first and ninth sections. The *plain intention* of the resolution is to ascertain if the various public securities set forth in the first section of the act of A. D. 1873, called vouchers in the report of the bond commission, were issued in accordance with law, and authorized to be consolidated by the act. If so, then the consolidated bonds and certificates of stock, taken in exchange for the vouchers and *resting on them,* were to be held and adjudged valid debts. If these vouchers were adjudged not issued in accordance with law, then the bonds and certificates of stock resting on them were to be so held in view of the resolution, and were not authorized to be consolidated—despite their consolidation by the act of A. D. 1873.

By the resolution of June 8th, 1877, the bond commission is directed to make a complete investigation. *First.* Of the entire amount of consolidated bonds issued under the act of A. D. 1873,

with particulars thereof. *Second.* Whether there is in the state treasurer's office, on file as vouchers, " canceled bonds, coupons and certificates of stocks of the issues described, issued in accordance with law, and authorized to be consolidated by the act above recited, to the amount required by the said act," A. D. 1877, p. 319.

Two inquiries are, by the second paragraph of Section 2, imposed upon the commission. The *First*, as to the vouchers, if they are of file in the treasurer's office. *Second*, as to the amount required by said act; that is, the amount specified therein upon recital.

Keeping in mind these instructions given to the commission, with those given to the Court of Claims, by the resolution of March 22d, 1878, in Sections 1 and 9, can there be a doubt of the duty or service to be rendered by this court; namely, an examination of the vouchers exchanged for consolidated bonds?

It is evident the legislature of A. D. 1876 and 1877 did not conceive itself bound by the former action of the same body, and felt itself at liberty to go behind the legislation of its predecessor. The propriety of this is not before the court.

That the above construction is to be placed upon the resolution, is otherwise clear. Why should the legislature refer to a special tribunal the question to test the validity of the bonds and certificates of stock, if the validity of these securities was regarded as established by the act of A. D. 1873? Why designate to the court, if the bonds and certificates of stock were valid debts under said act, the futile inquiry, if they were valid debts *as resting* on vouchers or securities which were invalid as not being issued according to law? The report of the bond commission assails the validity of the consolidated bonds and certificates of stock, upon the ground that they rest upon insufficient or invalid securities, securities which were not debts, and this position is not changed or enlarged by the resolution which creates the Court of Claims, and refers to the report.

This view of the jurisdiction and power of the Court of Claims disposes of the several propositions of the plaintiffs. The second affirms : " The consolidation act creates a contract between the state and every holder of her debt accepting the terms thereof,

whereby, in consideration of mutual advantages, a composition of their claims was made, which is final and conclusive."

No opinion is expressed, nor intended to be, of the force and effect of this proposition. It is enough to say the question presented is outside of the resolution, and not found in its words or intent, without departing from the ordinary meaning of language.

It is manifest that the third proposition of the plaintiffs—" Because the state, by her action otherwise, has precluded herself from denying the obligation of any of the debt recognized as valid in the consolidation act"—comes within the reasons above stated, and cannot be considered by the court.

The first proposition of the plaintiffs, that " the consolidated bonds are coupon bonds, payable to bearer, that is to say, negotiable instruments in the hands of *bona fide* holders for value before maturity," is not within the scope of the resolution, but may be modified to express the real question.

The proposition, stated affirmatively, is, that the vouchers, that is, " the canceled bonds, coupons and certificates of stock," in exchange for which consolidation bonds and certificates of stock were taken, were issued in accordance with law, and authorized to be consolidated by the act of 1873, and (the vouchers) also as issued in accordance with law, and further designated and described in *Schedule* 6 of said report (bond report.)

It becomes necessary to consider the contract between the state and the parties to whom the canceled bonds, coupons and certificates of stock were sold or transferred, in which way the state is made a party, and how such contract is to be construed.

The state, proposing to borrow money, offers its obligations for acceptance, not to one or two persons, but to capitalists of every country. The terms of obligation and discharge are expressed by an act of assembly.

This act is no secret document, but a high and public record. The party, too, acting for the state with whom the lender is to treat, is pointed out. All this is necessary and becomes fixed, not flexible, like a contract between citizens; but the offer simply is submitted for consideration, awaiting acceptance or rejection; and here, also, the agent for the state is without any discretion

such as the act confers. His power is special, and he cannot modify or enlarge his instructions.

The lender thus has it in his power, by referring to the legis-islation of the state, to understand the exact terms of the offer, the agent with whom he has to deal, and the result of his acceptance. He should bear in mind that upon a deviation from the legislative offer, which no one, unless empowered, can assent to, the state is not bound. In a word, a bond issued under an act of assembly is so connected with it as to make substantially one contract. A bond of the state, issued without legislative sanction, is a nullity.

A state as a borrower of money may become bound as an individual, though not responsible in the same mode. But it is to be remembered that there can be no equality between the state and its officer and agent who acts as under a mandate. An individual is liable to the extent of the power apparently conferred on his agent; but the government is liable only to the extent of the power actually conferred. *Pierce* v. *United States*, 1 *N. & H.* 270.

This principle is specially applicable to the over-issue of bonds under cover of the act of 1868, to raise funds to pay interest on the public debt. In relation to these bonds issued for payment of interest on the public debt, it appears that the first issue under the power conferred by said act was for $1,000,000. The purpose of this issue as expressed was to procure a loan to pay interest on the public debt. On the face of the bonds of the first issue the title of the act is set forth in full, the date of the act also being stated in the body of the bond. Waiving the question whether more bonds than amounted to $1,000,000 on their face could be issued until $1,000,000 was realized from their sale, it is apparent that there was an unauthorized excess of issue in number and amount. The issue of the second $1,000,000 of bonds was made under the same act, the bonds similar in every respect, except that instead of the title of the act being inserted in the bond, there was substituted for it the words, " Issued under an act approved August 26th, 1868."

There is no disputing the fact that bonds were issued purporting to be under this act, which produced more than $1,000,000.

This appears from the act of A. D. 1873, which authorizes the funding of $197,000 more than the $1,000,000 authorized by the act of August 26th, 1868. Is the state responsible for this over-issue of the bonds for $1,000,000 on their face—or for the over-issue in excess of bonds necessary to be sold to produce $1,000,000? In either case there was a positive want of authority or power in the agents of the state to issue bonds beyond a certain number or for more than a certain amount. This is not the case of power irregularly exercised, but the total want of power. It is a radical defect of title, which will avail against a *bona fide* holder of the bonds.

The officers of the state issuing these bonds and selling them were agents for a special purpose, and could not bind the state beyond the power expressed. 2 *Kent* 325, note A ; *Wilkinson* v. *King*, 2 *Comp.* 325 ; *Hartop* v. *Honne*, 3 *Atk.* 44.

A special agent has no discretion. All government agents (unless otherwise empowered) are special agents. *Anderson* v. *Kornley*, 21 *Wend.* 279 ; 2 *Kent* 620, 621, note A ; *Gordon* v. *Buchanan*, 5 *Yerg.* 71.

To say the least, the bonds over-issued as above are without authority of law. *N. Y. & N. H. R. R.* v. *Schuyler*, 34 *N. Y.* 30 ; *De Vass* v. *City of Richmond*, 18 *Gratt.* 362.

The conclusion is that the bonds of the second issue under the act of August 26th, A. D. 1868, in excess of $1,000,000, were not issued in accordance with law, and authorized to be consolidated by the A. A. 1873.

The question of greatest importance raised by the report of the bond commission, at least involving the largest sum of money, is that called " The Hypothecated Bonds and Coupons." The plan adopted by the officers of the state in the wreck of its credit was the common one of borrowing from Peter to pay Paul. Had the credit of the state been good and its bonds at par, slight loss might have resulted from this operation. But in this scheme not only must the agents effecting the exchange of credit be paid, but there was superadded a constantly increasing volume of debt, arising from the difference between the market and the par value of the bond, which the purchaser could claim. The multitude of South Carolina securities on the market was

so great or the credit of the state so low that in November, 1871, the Orr bonds, regarded as the best, sold for twenty-eight and one-half per cent. in New York. To continue the sale of the bonds at such rate was to bankrupt the state, and the policy was preferred of obtaining loans by a pledge of the securities.

The two acts of assembly of August 26th, 1868, gave no power to pledge the state bonds for loans. *A. A.* 1868, *pp.* 18, 19. This power was first given by the act of 1869, approved February 17th, (*A. A., p.* 182,) as to the loan contemplated by this act, which was required to be made within twelve years from the time of its passage. By a subsequent act (March 26th, 1869, p. 258,) the power was given to pledge for loans all the bonds of the state in its possession, and extending the time for the loans for two years from August 26th, 1868. It may be inferred the value of these securities did not improve; probably it decreased. The financial agent could sell or pledge; yet, although the face value of the bonds pledged was nearly four times the amount of the loans, he never sold in relief of the pledged securities, the evidence showing increasing distrust of the collaterals as a sufficient indemnity.

These pledged bonds were never relieved or released, except in one or two instances, in small quantities, and were sold or otherwise disposed of by the pledgees, as appears by the testimony. Government bonds, payable at a future day, especially when the day is distant, have been a favorite mode of investment for those not actually engaged in trade or handling money itself. With the aged and trustees it is a preferred security, as it proffers safe and certain returns without supervision on their part. The reason is obvious. The community of men forming a state is surely safer than any single person of the commonwealth. When the faith, credit and funds of the state are pledged for the redemption of the principal when it becomes due, and for the payment of interest in the form of coupons in the meantime, the highest security is given. The honesty and wealth of the community are elements of increased security for the payment of the bonds. So, also, the permanence of government enters into the essence of government bonds, for a state undergoing changes, some of which may overthrow its form or existence in ten years,

can give no assurance for the payment of a bond at the end of twenty. In theory, at least, the bonds of a government should be always at par, as the credit of the whole state, when the property of all individuals is bound, should exceed the credit of any single member. It is obvious that when these bonds were used as collaterals there was a wide departure from their common use. Seldom have state bonds been used as a guaranty for the payment of doubtful obligations. Ought not the very use to which they were applied have been a warning that something was wrong?

The credit of a state is a sacred thing; should not be prostituted to every common purpose, and hawked about on 'change like the note of a huckster. Certainly the circumstances surrounding these bonds would have suggested a rigid scrutiny of their legal origin and of the power of the possessor to dispose of them. Objection is taken by the defendant that the bonds issued under the two acts of August 26th, 1868, could neither be sold nor hypothecated after the expiration of two years from the date of said acts. The act passed February 17th, A. D. 1869, limits the time for loans to twelve months, and authorizes hypothecation for loans. The act of March 26th, 1869, extends the time for negotiating loans under the acts of August 26th, 1868, to two years, and authorizes the pledging of bonds as security. These loans are:    *    *    *

From this statement it appears that all the loans were made after August 26th, A. D. 1870, more than one year after loans were authorized to be made under the acts.

The act of March 26th, 1869, declares the financial agent is " authorized to pledge the bonds of the state, which the state now has or may hereafter have in its possession, as collateral security for state loans," with a proviso that in all transactions he shall conform to the provisions of the acts of August 26th, 1868.

It is to be observed that the power to hypothecate is connected with the loans. Hypothecation, however, was adopted as a mode of effecting the loans. The simple question, then, is, within what time do the acts authorize a loan and hypothecation?

The answer is given by the acts: Within two years from the

passage of the acts of August 26th, A. D. 1868, and one year from the passage of the act of February 17th, 1869.

It is needless to say that after the time limited by the acts the governor could not, under acts of August 26th, 1868, nor the governor, comptroller-general and treasurer, under the act of February 17th, 1869, negotiate state bonds, nor authorize the financial agent to do so.

It may be submitted, in reply to this, that time was not the essence of the contract. The law is otherwise. *Green* v. *Biddle*, 8 *Whart.* 34.

That time may not be of the essence of a contract is a principal of equity jurisprudence. In cases like the one under consideration, equity follows the law. *Hipwell* v. *Knight*, 1 *Y. & Coll.* 415; 2 *Story*, §§ 775, 776; 2 *Kent* 621, *note e; Batty* v. *Carswell*, 2 *J. R.* 48.

That time was regarded as an essential element of the contract is shown by the action of the legislature extending the time to effect the loans from one to two years. In plain language, a power of attorney was given to certain officers of the state to borrow money within twelve months or two years, and when not accomplished in that time their power ceased. It was not a power which these officers could exercise *ex-officio*. There was a conferred power, special, from which they derived the right to act, which they could not modify, and from which they could not deviate.

It is deemed scarcely necessary to refer to the question of notice in relation to the contract contained in the acts. All the bonds refer to the acts under which they were issued in such unmistakable language as to give full notice of their provisions upon reference to them.

There is notice of another character affecting the bonds—not only that they were issued after the power had ended, but that those dealing with them were not *bona fide* holders without notice.

Governor Scott, at an early day, (in his message of November, A. D. 1871,) states the fierce warnings given by the press of the state, that the bonds in question would never be paid; that they were bayonet bonds, issued by a bogus legislature; warning capi-

talists of New York they would not be paid; that the whole scheme was a job and a swindle, and that the bonds would never be recognized when property-holders and honest men had a majority in the councils of the state. A page of language of this character was inserted in his message—a public document.

Governor Scott says, further, that these warnings began in the press but ten days after the new government went into operation —July 17th, 1868. He declares, also, the action of the Taxpayers' Convention, in May, A. D. 1871, and of the Charleston Board of Trade, had a most disastrous effect upon the securities of the state, and compelled a large and rapid increase of the public debt. He thus furnishes, in a public document, the notices against the bonds, and the effect of the warnings in New York.

Human credulity would far transcend human belief if it could be supposed that banks and bankers dealing in public securities could be ignorant of these expressions in regard to the bonds. The conclusion is that the loans and hypothecation of securities negotiated after the periods of time limited by the acts aforesaid, were not issued in accordance with law, nor authorized to be consolidated by the act of 1873.

The first act, providing for the appointment of a land commissioner, was passed March 27th, A. D. 1869.

The act establishes an office, and the officer was to be known as the land commissioner of the State of South Carolina. He was to be appointed by an advisory board, which consisted of the governor, comptroller-general, state treasurer, secretary of state and attorney-general.

The appointee was to give bond in the penal sum of $20,000 for the discharge of the duties of his office, and was to receive a salary of $2000.

To this land commissioner, who could scarcely think without the sanction of the advisory board, the legislature directed the treasurer to issue "bonds of this state in the sum of two hundred thousand dollars, with coupons attached." The plain intent of the act was that the bonds should be placed in the hands of the land commissioner; his duties involving purchases and sales of lands, the direction in the seventh clause of the act as to invest-

ment of moneys from sales, to constitute a sinking fund for the redemption of the bonds, indicate a separate management, and that they were not to be merged in the general funds of the state.

Except the direction that the bonds were to be issued to the land commissioner, there is no direction as to their sale, nor any limit in the act of the time within which they could be sold.

The bonds issued under this act bear upon their face the words : " Issued under an act approved March 27th, 1869."

The next act in relation to the land commission was passed March 1st, A. D. 1870, for an issue of $500,000. These bonds were issued without limit as regards time, but the power of negotiating them was withheld from the land commission.

The bonds were to be negotiated by the advisory board, in such form and manner as the board should determine. The bonds issued under this act bear upon their face the words : " Loan under act approved March 1st, 1870."

On the 26th of March, 1869, the day before the passage of the first land commission act, the legislature, by act, authorized the financial agent " to pledge the bonds of the state which the state now has or may hereafter have in its possession, as collateral security for state loans," with the proviso " that in all the transactions he shall conform to the provision of 'An act entitled an act to authorize a loan to redeem the obligations known as the bills receivable of the State of South Carolina,' " ratified the 26th day of August, A. D. 1868.

There was by Section 2 of this act an amendment of the acts of August, 1868, extending the time for loans to two years.

Waiving the question whether, under the first act, any one could negotiate the bonds but the land commissioner, and consequently whether their hypothecation by the financial agent was not illegal, it seems plain that the pledging of the bonds issued under both acts is objectionable.

The bonds were impressed with all the restrictions attaching to other bonds pledged by the financial agent.

Neither the loans nor the hypothecation were made within two years—the time limited.

For the reasons stated above, in regard to the hypothecation of other bonds, the conclusion is that the land bonds hypothe-

P

cated were not issued in accordance with law, nor authorized to be consolidated under the act of assembly A. D. 1873.

The defendant objects that the coupons detached from bonds between June 10th, 1874, and June 24th, 1874, amounting to $331,996, have not been issued in accordance with law, nor authorized to be consolidated.

The testimony of Henry L. Tappan shows how coupons accumulated in the treasury until November, 1872. He says they were put away in the vaults of the treasury, and when he left the office, November 1st, 1872, they had not been disturbed.

James O. Ladd, in his testimony, says that while he was in the treasury " there were matured coupons clipped off from bonds sent to Kimpton. These coupons were put in packages and put away in the fire-proof vault, inside of the safe in the treasury. They were not canceled at the time. They were put away, and so remained uncanceled up to the time he left the office."

According to John L. Neagle's statement, he received, in the early part of A. D. 1873, from Niles G. Parker, about $100,000 of coupons for his action in and as his share for the funding of the coupons. His doubts were quieted by the assurance of Parker that the thing was all right.

He turned over to Y. J. P. Owens, for funding, a large part of the coupons—between $80,000 and $90,000. He again was disturbed about the character of the transaction, and having "ascertained that they [the coupons] were wrongfully in his hands, destroyed them, viz., the balance, about $12,000, within the last twelve months."

In the settlement with the financial agent, (*Journal, House of Rep.*, 1872, 1873, *p.* 307,) it is stated the agent had returned to the state all coupons not paid, excepting on outstanding bonds owned by third parties or held as collateral as hereinafter mentioned.

The coupons of bonds owned by third parties would be the property of the owners of the bonds, and out of Kimpton's reach, unless upon payment. The proof is, the bonds and coupons pledged were never paid by Kimpton. The above facts corroborate the testimony of Parker, who states at length the scheme between Scott, Chamberlain, Neagle, Kimpton and himself to

fund the coupons through Owens or others. Aside from the testimony, nothing can be more significant of the transaction than the conduct of the parties engaged in it. There is no pretence that the state owed them who were then its present or late officers, or that they obtained the coupons in any business transaction. Why fund through another? They are dealing with tens of thousands in a manner so free, as to suggest the idea of "come easy, go easy." Does it accord with human conduct that Kimpton, who, after his settlement with the state, claimed a balance of thousands as due him, would have shared with others, without equivalent, valid securities that would have paid or secured him? *Credat Judæus!*

The conclusion is, that the said coupons were not issued in accordance with law, and authorized to be consolidated by the act of 1873.

No doubt the legislature intended, by a reference to a legal body, that the questions submitted should be considered in their legal aspect. The question for this court is not what the state should do, what steps policy suggests or good faith demands. In the view taken, these questions were not before the court. The simple question was, were the vouchers—that is, " the canceled bonds, coupons and certificates of stock "—" issued in accordance with law and authorized to be consolidated by the act of the general assembly, approved December 22d, 1873?" To this question the above conclusions are given as answer.

Any assumption from the foregoing views, that the consolidation bonds, issued under the act of 1873, are valid or invalid, in other respects would be gratuitous. The propositions on behalf of the bondholders, stated above, have not been considered with any purpose of their decision. The effect of the act of 1873, the acts of the state authorities, the vesting of rights under acts of assembly, though afterwards opened for consideration, with other questions in the interest of the bondholders, the constitutional point made in the answers, want of registration and the like, on behalf of the defendant, are all questions about which no opinion is expressed.

There is a class of cases, not many in number, which have held the owners of municipal bonds, which were subject to ex-

ceptions, entitled to certain payments. These were instances where equitable principles prevailing and the corporations having received some value for their securities negotiated, refunded to the purchasers their money. The case of *County of Armstrong* v. *Brinton*, 47 *Penna.* 370, and others therein referred to, are examples. A suggestion is scarcely ventured if a settlement of the bonded debt could be thus effected. Yet, if practicable, it should satisfy any one but a speculating bondholder, and at the same time not be unjust to the state.

*It is ordered, adjudged and decreed,* That the " canceled bonds, coupons and certificates of stock," called " vouchers," in relation to which conclusions have been announced above in this opinion, were not issued in accordance with law, and authorized to be consolidated under the act of 1873. And that the consolidated bonds and certificates of stock exchanged for said " vouchers " to the extent and so far as the said consolidated bonds and certificates of stock rest upon said " vouchers " for their validity, were not binding obligations of the State of South Carolina.

ALDRICH, J. My regular duties in the Circuit will prevent me, at this time, from presenting an extended opinion of the questions submitted to us, by the joint resolution creating the Court of Claims. I concur in the conclusions reached by Judge Thomson, and although his reasoning is perfectly satisfactory to me, so far as it goes, yet I am disposed to go further and hold that this whole legislation was so gross a fraud on a helpless people, that it will be the greatest injustice to force the innocent taxpayer to pay the debts thus contracted by an usurping government without the warrant of constitutional authority, against which the taxpayers loudly and earnestly protested, and which so astounded the good faith of the commercial world that none but the most reckless speculators would engage in the disreputable transaction to utterly ruin a plundered state prostrate in the hands of her invaders.

The opinion of Judge Hudson shows great research, and is prepared with care and ability, supposing these usurpers had the legal and constitutional right to impose these oppressive burdens, but as that lies at the very foundation of the question submitted,

I cannot acquiesce in it. Reserving the right to file a more extended opinion, I concur with Judge Thomson.

Subsequently Judge ALDRICH filed a more extended opinion, as follows:

I was not able to prepare an opinion at the last meeting of the court for consultation, because I had not completed my Circuit business. As I did not think that my assignment to this court was intended to interrupt or delay my Circuit duties, I reserved the right to give my reasons in the future, when I had time to prepare the same, which I now propose to do.

Of all the questions that most distract the judicial mind, these *semi-politico* are the most embarrassing. There is always more or less feeling of party spirit, prejudice, or a popular pressure very hard to resist, interfering with the free exercise of sound reason, even in the clearest head and the best balanced mind, unconsciously warping the soundest judgment—not that the judge is less firm, less conscientious, but such is the constitution of the human mind that he finds it difficult to divest himself of the opinions, perhaps prejudices, that may have crept into his mind when the legislation on which he is called to pass was under discussion. I trust I will not be so influenced, as I had no expectation of being selected as a member of this court, and had not examined the questions previously to my selection.

The history of the financial legislation which called this court into existence has been so fully given in the clear and able judgments of Judges Thomson and Hudson, that I do not propose to encumber this opinion with a further reference thereto.

Why was the court selected? If the matter referred was a mere question of commercial law, the ordinary tribunals of the state were open for that purpose. Nay! Story, or any other writer on negotiable paper, would settle the controversy. The court then, as I take it, was clothed with much larger and broader powers than the mere consideration of negotiable securities; it was intended that we shall go to the very bottom of these transactions, and see if authority was vested in the legislature creating this indebtedness to bind the state, or to pledge her faith and credit.

It is a court of conscience as well as a court of law; it is bound to preserve the honor and good faith of the state, at the same time to see that the *bona fide* holders of her securities are protected in their rights, while the innocent taxpayers, on whom the burden of payment will fall, are not oppressed by the assumption of an indebtedness not authorized by law.

In the first place, I hold the provisional government of President Johnson, and the reconstructed government inaugurated under military rule, are both extra-constitutional, and, if it be true, as decided in the Tennessee case, that the state never lost her entity by the act of secession, then South Carolina at the close of the war was the same state, under her old constitution, that she was when she attempted to escape from the Union ; and both the provisional government of President Johnson and the reconstructed governments of Scott, Moses and Chamberlain are usurpations. The conventions adopting the constitutions of 1865 and 1868 were not called and elected as directed by the fundamental law, and all of the subsequent legislation is not binding on the state, except so far as she chooses to acquiesce therein.

That this political usurpation was well understood not only here, but all over the political and commercial world, is abundantly proved. The very first act of this usurpation startled the civilized world. The military order directing the election of delegates to the constitutional convention of 1868, excluded nearly one-third of the property-holders of the state from the polls, thus disfranchising a large portion of the virtue, intelligence and property of the state, who were not represented in that convention.

In less than three years after the Scott administration went into office, so frightful were the taxes, so rapid was the increase of the public debt, so audacious was the spoliation of the public money, that the taxpayers in 1871 assembled in convention to enter their protest against this spoliation and to record their notice to the world that they would not pay the debts then contracted and thereafter to be contracted by this usurping government. It is argued that this notice had no legal effect, it was the resolution of a mere "political mass meeting," whose actings and doings are not binding. It was the only mode left to

advertise the world against the open frauds and robbery then being committed. The supporters of the state, the taxpayers, had been defrauded of their constitution by these invaders and usurpers, and being unrepresented in the legislature, the virtue, intelligence and property of the state upon whom the burden of paying these debts must fall, seeing the fraud, feeling their inability to meet their payments, knowing that the usurpers were remorseless and without character, met in primary assembly in each county in the state, and elected their wisest and best men to represent them in that convention. So imposing was the body that the Scott administration found it necessary to yield to the pressure of their moral influence, and, to deceive them, actually perpetrated another fraud, by presenting false statements of the debts and financial condition of the state.

This in a manner allayed apprehension, and induced the convention to adjourn without applying a specific remedy. In a few weeks after the adjournment, it was discovered that the accounts and representations were false, and made for the purpose of deception. In addition to this, every newspaper in this state, and newspapers in all the states, heralded this spoliation, this open, barefaced robbery. In the city of New York, the theatre of these infamous transactions, a leading journal exposed the whole fraud, discovered by a prominent member of the taxpayers' convention then on a visit to that city, and who had been deceived by these false representations; correspondents from all parts of the Union to leading journals denounced it. Mr. Pike, in his "Prostrate State," published in the city of New York at the very time these bonds were being put upon the market, branded these usurpers as "political banditti." To say now that the speculators in this branded paper are innocent holders for value without notice, is a proposition that defies the most extravagant credulity.

If ever a fraud was made patent to the world; if ever a people were put upon their guard against peculation and open robbery, it was done in these cases. The notice was so universal that no one dealt in the bonds, coupons and certificates, except the wildest speculators, at a ruinous discount. I adjudge the question of notice as fully established.

I take it, then, that every purchaser that dealt in these securities took the risk of the speculation, and relied upon the courts to enforce the obligations under the strict rules of technical law, not regarding the great wrong committed against the state. It was speculating upon the miseries of a helpless people. Just see to what extremes men will go where interest calls! In all this discussion we have heard a great deal about the innocent holder for value; the credit of the state jeopardized; her faith and honor pledged; but not a word about the innocent taxpayer who had no voice, whose hands were bound, whose tongue was tied, and yet who is expected to pay these obligations against which he was protesting all the while, in the most earnest way left open to him, the press of the country. Our own people have become interested in a small degree in those securities, hence their claims.

Now, mark! The legislature who passed the consolidation act was of the same complexion as those who created the debt. In that very consolidation act they repudiated outright $5,965,-000 of conversion bonds, and now we are told that this *respectable* body has pledged the faith and credit of South Carolina to pay the debt created by the act.

It surprises me to hear gentlemen whose state pride cannot be questioned, who are proud of our history and traditions, arguing with sincerity that the faith and honor of their state could be pledged by such a band of invaders and shameless robbers. I cannot, as a South Carolina judge, admit that it was ever possible for the faith and honor of my native state to have been in the keeping of the legislatures and administrations who created the indebtedness. To say that these men, so entirely destitute of public virtue or private character, who acknowledged $5,965,000 of fraudulent debt and repudiated it, who scaled down the honest indebtedness of the state incurred before the war, dollar for dollar, to fifty cents on the dollar, to give a show of integrity to the debts contracted by themselves since their usurpation of the state government, could pledge in the same act the faith and honor of South Carolina, is a reproach to her history and traditions.

But, suppose it be conceded for the sake of the argument that

the government creating this indebtedness is constitutional and had the authority to pledge the faith and credit of the state, while it may be admitted that if a state or municipal government or a corporation empower its officers to create a debt by issuing bonds, coupons and certificates, the holder for value is not bound to look into the regularity of the issue; yet it never has been contended that he could waive the necessity of inquiring into the authority. In *Marsh* v. *Fulton*, 10 *Wall.* 683, it was held that the holder, though *bona fide*, for value without notice, was bound to look into the origin of the title.

And no case brought to the attention of the court controverts this sound law. If, then, these acts were passed without constitutional authority, what becomes of these obligations? Were they not issued without authority of law and void *ab initio?* Were not the purchasers bound to look into the origin of the title? To argue that the consolidation act is not an act to create a public debt, because it is entitled " An act to reduce the volume of the public debt," is a mere play upon words. If the volume of the debt thus to be reduced was without constitutional authority, by what power of argument, reason or logic can it be maintained that the new debt to take its place is exempt from the constitutional restriction? If the original debt was void for want of authority, what healing power has a subsequent act afflicted with the same infirmity? Does it not still create a public debt? Is the character of the legislation altered by reducing the volume? It appears to me that the matter is so clear from the statement of the proposition that it is a waste of words to pursue the argument.

It is further argued that *Morton, Bliss & Co.* v. *Comptroller-General* settles the question, that it is the law of the land. I agree with Judge Hudson that the decision is the law of that case; but emphatically deny that it is binding in this or any other court, when that constitutional question comes to be considered. No judge, who has independence of thought or self-respect, is bound to stultify himself, or stifle his conscience, because an appellate tribunal has made a decision, the error of which is patent on its face.

But I do insist that two-thirds of a quorum is not the two-

thirds required by the constitution. To maintain that proposition, appears to me to be revolting to the good sense and the good conscience of every just-minded man. As a judge, I am sworn to preserve, protect and defend the constitution of the state. Can I, with that oath staring me in the face, adopt such a heresy and nullify the organic law?

Is the decision of the Supreme Court more binding on me than the constitution of the state? Is the creature more to be respected than the creators?

It is not necessary, here, to argue what the convention meant when it used the term two-thirds in the constitution. If it did not receive two-thirds of the representations, it was a fraud on the people. To say that because a different phraseology is used in different articles of the constitution warrants a different rule of construction as to each, is not supported by reason or authority. What is the theory of the constitution? That a certain class of legislation shall require a two-thirds vote. This decided majority is intended to protect the people against the passage of acts which the convention supposed would be oppressive. It was intended as well to call the attention of the citizens to the legislation proposed, and by the difficulty of securing so decided a majority, prevent legislation which might inconvenience the people of the whole state, or impose burdens hard to bear.

If this be so, is it not obvious that the whole purpose of the constitution is defeated, to say that two-thirds of a quorum, which is a minority of the representation, is the two-thirds contemplated. I mean not to criticise those who differ from me. Gentlemen equally conscientious and patriotic, take a different view, but every man must judge for himself in a matter of conscience, and thus judging, I announce that I cannot give force and effect to this decision.

It is further contended this act is a compromise, and the state, having obtained the benefit of the compromise, is bound, in good faith, to carry out its terms. The proposition, as I look at it, appears to me to be a very curious one. It is not denied that the administrations of Scott, Moses and Chamberlain, having piled up a frightful mountain of debt, which they saw it was impossible for the impoverished taxpayers to meet, and the payment of which

they knew would be resisted, for most of it they had stolen, having repudiated $5,965,000 of the debt acknowledged to be fraudulent; having scaled the honest debts of the state fifty cents on the dollar, to give a semblance of integrity to these suspicious debts which they put on a footing with the honest, have effected a compromise which the innocent and honest taxpayers, whom they have so mercilessly robbed, are bound, in good faith, to carry out, now that they have come to their rights! As a question of political economy and policy, this may be a very good settlement. This court has nothing to do with that. It is for the legislature to adopt a policy. But, as a question of law and conscience, I hold that the securities enumerated in the decision of Judge Thomson, are not valid obligations binding on the state.

And it is so adjudged and decreed.

### DISSENTING OPINION.

HUDSON, J. These are cases made up for the purpose of testing the validity of certain bonds of the State of South Carolina, known as consolidation bonds, issued under act of December 22d, 1873, " to reduce the volume of the public debt."

The plaintiff, in each of the nine several cases above, alleges, respectively, that he is the lawful owner and holder for value of the coupon sued upon, and of the bond to which the same belongs; that demand has been made upon the proper officers of the state for payment, which has been refused, and demands judgment against the state, &c. Defences are set up by the state in her answers to these several suits, which, when grouped together, may be classed as follows :

1. That a portion of the vouchers surrendered, and for which these consolidated bonds were in part issued, had been by the financial agent clipped or detached from certain " relief of the treasury bonds " which were never issued, and never became a charge against the state. The coupons so detached, it is alleged, amount to over $9000.

2. That a portion of the vouchers surrendered, and for which some of the bonds in suit were in part issued, had been detached from certain conversion bonds, and in the process of conversion should have been attached to the certificates of stock in lieu of

which the conversion bonds were issued, and filed away with said certificates of stock as vouchers. The coupons thus detached amount to nearly $10,000.

3. That a portion of the vouchers surrendered, and for which some of the bonds in suit were in part issued, were coupons maturing on or before July 1st, 1871, and as the state paid the interest on the public debt up to that period, these coupons must have been paid. The amount of coupons thus maturing, and in exchange for which consolidation bonds were issued, is $486,025.

4. That a portion of the vouchers entering into some of these bonds sued on embraces coupons surrendered by Y. J. P. Owens, as agent, by Governor Scott, and L. N. Zealy, amounting to $331,996, which coupons had been clipped by the financial agent from bonds before being issued, and had been by him sent to N. G. Parker to be fraudulently consolidated, and were consolidated in fraud of the act.

5. That a portion of the vouchers surrendered, and in exchange for which some of the bonds in suit were in part issued, consisted of bonds and coupons in the hands of the financial agent, which had been by him hypothecated after the time allowed by law. The amount thus hypothecated is alleged to have been $2,166,039.

6. That a portion of the surrendered vouchers which enter into some of the bonds in suit consists of the second issue of bonds "for the payment of interest on the public debt," alleged to be fraudulent.

7. A portion of the vouchers represented in part in some of the bonds in suit are the land commission bonds, all of which are alleged to be fraudulent.

8. That a large number of the bonds which were consolidated, and which are in part represented in some of the bonds in suit, were never registered in the treasury, as is required in Article IX., Section 14, of the constitution.

9. That the consolidation act, in so far as it creates a public debt, is unconstitutional and void, because not passed by a two-thirds vote of each branch of the general assembly, recorded by yeas and nays.

10. That several of the acts under which some of the recon-

struction bonds were issued (and which bonds were subsequently consolidated) were not passed by the requisite two-thirds vote of the general assembly, and were therefore void.

A great deal of evidence, oral and documentary, was introduced to substantiate the aforesaid facts alleged by the state in her defence.

We propose, first, to consider the question of the validity of the various bonds in suit upon the hypothesis that the allegations of fact by the state are true ; in other words, as if a demurrer to the answers had been filed by the bondholders.

To arrive at a correct conclusion upon the issues, we will be greatly aided by a brief statement of the financial legislation of the state from the ratification of the present constitution until the present period.

When the first legislature under the new constitution assembled, they found an empty treasury, and a state debt exceeding, in the aggregate, $7,000,000, including the obligations known as the bills receivable and the liability of the state for the outstanding bills of the bank of the state, and excluding the debt contracted in aid of the rebellion, so called, which had been declared void.

All reflecting men foresaw that under the administration of ignorance and cupidity there would be mismanagement of the finances of the state, and the speedy result was the inauguration of a system of reckless extravagance and profligacy on the part of the state officials and legislature, which soon rendered bankrupt the treasury of the state and destroyed her credit.   *   *   *

After the foregoing epitome of facts no further comment is necessary upon the reckless management of the state finances by those entrusted therewith.   Rather in a spirit of desperation than otherwise they procured or suffered the sixteenth amendment to the constitution to be adopted, which ended this species of financial legislation.

At this point we pause to recur to the steps which were taken during this wild extravagance, to investigate the condition of the debt of the state and the management of her finances.   For this purpose committees were appointed by the legislature from time

to time, and their reports, and the action of that body upon them, bear materially upon the great question before us.

That grave doubts as to the validity of a portion of the public debt existed is a well-known fact, and this fact is admitted in the preamble to the validating act of March 16th, 1872, the avowed purpose of which act was to cure all supposed defects and irregularities in the issue of certain classes of bonds therein specifically enumerated. That such was the legal effect of the act is expressly held in the case of *Morton, Bliss & Co.* v. *Comptroller-General,* 4 *S. C.* 430.

In 1871, because of the grave charges of illegality in the issuing of bonds under the various acts of the legislature, the house of representatives appointed a committee " to inquire into the matter of the over-issue of state bonds," and on the 20th of December, 1871, a joint committee of the house and senate was appointed to examine the accounts of the state treasurer, comptroller-general and financial agent. The report of the first committee is to be found on page 867 R. and R., 1871–2, and the full report of the joint committee, covering over three hundred pages, is appended to R. and R., 1871–2.

These reports are full and unsparing, and evince a spirit of candor somewhat surprising, considering the active complicity of its authors in the profligate financial legislation of the period. Be this as it may, it is certainly true that these reports laid before the legislature and the people of the state an amount of information touching the financial affairs of the state little, if any, short of the light that is shed upon the subject by the able report of the bond commission in March, 1878.

By these very elaborate reports of December, 1871, the state authorities, the legislature and the people were made aware of the number of bonds issued under each act, and of all the alleged defects and irregularities in their issue, sale and hypothecation ; a fact of the utmost significance in its bearing upon the issues involved in these suits, as will be seen hereafter.

On March 16th, 1872, a little more than two months after these very full reports, and in the face of these grave charges therein touching the irregularities of various classes of bonds, the

legislature passed the validating act, which declared all these various classes of bonds to have been duly and regularly issued.

One year subsequent to this significant act, the suit of *Morton, Bliss & Co.* v. *Comptroller-General,* was decided. In this suit nearly every objection—certainly, every substantial objection—now raised was then urged against the validity of the several classes of bonds, in lieu of which consolidation bonds at fifty cents on the dollar have since been issued. Every question was decided squarely against the state and in favor of the bondholders in that suit. It decided that the "bills receivable bonds," the "interest on the public debt bonds," the "relief of the treasury bonds," the "land commission bonds," were valid obligations of the state. The force and effect of this decision cannot be avoided by unfavorable criticism. Until overruled it is the law of the case, and rights acquired under it cannot be divested, even should it be now overruled.

But to defeat the practical operation of this judgment, the legislature, on December 22d, 1873, repealed the provision of law which required the comptroller "to give notice of the rate or per centum necessary to be levied upon the taxable property of the state." The operation of the writ of *mandamus* was thus avoided and the bondholders were baffled, being thus, to some extent, left in doubt as to what amount of her debt the state was liable for, and what remedies were available to them to enforce their demands.

In this state of the case, it being once more doubtful as to the ultimate determination of the question involved, and yet with full light before them, the legislature resolved to effect a final settlement of the bond debt of the state, and with this view, on the 22d of December, 1873, passed the "Act to reduce the volume of the public debt," commonly known as the "consolidation act."

This act rejects $5,965,000 of the conversion bonds as being illegal and void, and provides for the funding, at fifty cents on the dollar, of the entire remainder of the outstanding bonds and certificates of stock, and all outstanding coupons maturing and to mature on January 1st, 1874.

To preclude misunderstanding, the amounts of outstanding

bonds and certificates of stock issued under each act are carefully
given in figures, and conform exactly to the report of the treas-
urer of date October 13th, 1873.

By this report it appears that the entire debt of the state, evi-
denced by bonds and certificates of stock, was    $15,851,627 35
The act declared void......... ......... ......... ........    5,965,000 00

Leaving a balance of......... ......... ........ ......    $9,886,627 35

Which, funded as directed at fifty per cent., gives $4,943,-
313.67, as the ultimate consolidated debt of the state, being less
than one-third of the original amount, and much less than the
bond debt and liabilities of the state at the date of reconstruction.
In the spring of 1874 the act was put in operation.    The fund-
ing began, but had not proceeded far when a committee was
appointed by the legislature, of which Senator T. C. Dunn was
chairman, " to ascertain what bonds of the state have been funded
under the act to reduce the volume of the public debt, and what
interest coupons have been funded under said act."    The com-
mittee proceeded to New York and examined the financial agent
and his books, and gathered from these sources all available tes-
timony.    The full and searching report of this committee is to
be found in R. and R., 1874–5.    In it are reiterated the sub-
stantial objections as to over-issue, irregular hypothecation, &c.,
of bonds and funding of coupons now raised, and the committee,
we are told, urged the attorney-general to take steps to enjoin
the treasurer and arrest the work.

The legislature took no steps to interfere and the attorney-
general refused so to do, and, in his annual report, gave, as his
chief reason for declining to act, that the matters were concluded
by the decision in Morton, Bliss & Co.    In March, 1875, the
legislature appointed a committee to prepare an address to the
governor for the removal of Treasurer Cardoza for violating the
consolidation act in sundry particulars, chief among which were
that he had issued consolidation bonds in exchange for a large
amount of bonds which had been issued in excess of the number
authorized by the various acts; and had issued consolidation
bonds in exchange for a large number of coupons of bonds ma-
turing before July 1st, 1871, and of others which had been

clipped from the bonds as they passed through the hands of the financial agent, and before the bonds were put upon the market. See charges and specifications in *House Journal*, 1874-5, *pp.* 632-3-4.

Cardoza was heard through able counsel, viz., Hon. W. D. Porter, of Charleston, C. D. Melton, of Columbia, and the Hon. Leroy F. Youmans, the present attorney-general of the state. The whole subject was, by them, ably handled. The treasurer was acquitted of the charges of violating the act; the address failed, the intelligent white democrats, almost to a man, sustaining his action, and he was directed to proceed in his work of funding. He did proceed, and funded a much greater number after than he had done before, the public generally supposing that the act was thus established as a final adjustment of the debt.

The validity of the bonds which he issued in lieu of the securities then assailed, is now put in issue upon objections to the surrendered securities, which were then urged before the legislature, and overruled by that body, and chiefly by the vote of the real representatives of the taxpayers. It is a notable fact that the arduous labors of the bond commission, of six months' duration, have brought to light few new facts touching the bond debt of the state. In the reports of the committee of 1871, Senator Dunn's committee of 1874, and the proceedings in the trial of Cardoza, nearly all the irregularities are charged which are preferred by the bond commission. The whole ground is covered if we add thereto the record in Morton, Bliss & Co. The result of much debate in the legislature upon the report of the bond commission, was the reference of the vexed question of the validity of the consolidation bonds to this court.

By voluntarily submitting the question of her liability to the courts, the state has rejected the idea of repudiation, and declared her purpose to abide by the law. No more honorable course could have been adopted.

This narrative of legislation brings us to the questions at issue.

In the outset we remarked that, in the discussion of these questions, we are bound to accept the constitution of 1868 as the fundamental law of the land, just as much so as we did that of 1790, and all acts of the legislature from 1868 to 1876 as binding

upon us as were acts prior to the war, subject, and only subject, to the well-established rules of construction and interpretation.

It is worse than folly, in a legal argument or legal opinion, to hold that we have been living under a usurpation, and hence are at liberty to abide by such laws of that period as are pleasing, and to disregard such as are odious. It matters not how republican, how radical, how ignorant and how corrupt may have been the legislatures from 1878 to 1876 inclusive, nevertheless, the laws which they placed upon the statute books are none the less binding upon us until repealed, and rights acquired under them are as much to be protected by courts, as rights acquired under prior legislation. Any other doctrine would be fundamentally wrong, and fruitful of indescribable confusion and evil. Legislatures can make laws and repeal statutes. Courts can only administer them as they are, saving only the right to interpret them and to declare their binding efficacy.

Nor are we called upon to determine the constitutionality of the consolidation act. The legislature has accepted it as valid and binding, and the treasurer of the state is still engaged in carrying out its provisions. The state is unwilling to surrender its marked advantages. We are only required to determine the validity of certain classes of consolidation bonds which are assailed, not on account of the supposed unconstitutionality of the act, but because it is alleged that these bonds were issued in exchange for vouchers not enumerated in the act, or not designed by it to be consolidated. We have no hesitation in saying, however, that the act is constitutional. It does not pretend to create a debt, but "to reduce the volume of the public debt." It is a settlement and adjustment of the debt of the state, and, this being its intention, it was regularly enacted.

Under the joint resolution of March 22d, 1878, establishing this court, its jurisdiction is "to hear and determine any case or cases made up or brought to test the validity of any of the consolidation bonds, coupons and certificates of stock, or any of the various classes of them mentioned in the report of the bond commission, as resting on vouchers not issued in accordance with law, and authorized to be consolidated" by the consolidation act of December 22d, 1873, "and also as not issued in accordance with

law, and further designated and described in *Schedule* 6 of the said report."

Section 9 provides that cases be made up " to test the validity of said consolidated bonds and coupons and certificates of stock mentioned in said *Schedule* 6, bringing before the court the various classes of vouchers which, it is alleged in the report of the said commission, impair the validity of the said consolidated bonds, coupons or certificates of stock or any of them."

The consolidation act of December 22d, 1873, is drawn with care. It specifies the various classes of bonds to be funded, and the amounts outstanding; and designates the bonds which are void, and not to be funded. The valid are separated from the void. The question of the validity of outstanding bonds is here definitely settled by the legislature. No discretion is left to the treasurer, but his duties are ministerial and compulsory. The act was passed by the legislature deliberately, and with full light before them. Before them were spread the various acts under which the bonds were issued; the journals of the legislature, the reports of the treasurer, comptroller-general and financial agent; the very full reports of investigating committees, to say nothing of the discussions in the public press, and they also had the benefit of the legal decision of the case of Morton, Bliss & Co.

It is no apology to say that the legislature was a body of illiterate men. The binding efficacy of an act is not to be measured by the intelligence of its authors. We hold, therefore:

I.

That every bond issued under act of December 22d, 1873, for vouchers and securities therein enumerated, is a valid obligation of the state, notwithstanding any defects, irregularities and illegalities to which the surrendered vouchers may be obnoxious. These are all waived and effectually cured by the act, and it is vain to say that the legislature had no power to do this.

The state is *ex vi termini* of the act estopped from questioning the validity of any bond issued in exchange for any of the securities enumerated therein. The law of estoppel, whether by matter of record or *in pais*, applies to states as well as to individuals. By this law the hands of a state are effectually tied,

and her mouth as firmly sealed, as if she were an humble person. But not only by the terms of the act is the state estopped, but she is likewise, by her other actions, precluded from denying the obligation of any part of the debt recognized in the consolidation act as valid, and it was with a view to make this appear, that we gave a brief statement of her acts authorizing the issue of bonds and the doings of the legislature in the work of investigating the state's finances.

That a state may be estopped from setting up as a defence, mere irregularities in the exercise of a power conferred on its agents, by its failure to repudiate promptly such acts when performed, or to restrain their performance in time to prevent mischief, has been definitely settled by repeated adjudication.

A leading case, in support of this doctrine, is that of *Delafield* v. *State of Illinois*, 2 *Hill* 175; 26 *Wend.* 192; 8 *Paige* 327. Did space permit, we would be pleased to cite extracts from the several learned opinions delivered in this case. Suffice it to say, however, that it was contended by Delafield, who had purchased from the agent of the State of Illinois $500,000 of her bonds, at less than par (they were required to be sold at par), that the conduct of the governor, auditor and fund commissioners amounted to a ratification of the sale. The force of this argument gave great concern to the learned judges who tried the cause, and caused them to hesitate; but they finally accepted the argument of the counsel for the state, and held that these officers were incapable of making or of ratifying such a contract; that this power rested solely in the legislature, which body had, with great promptness, taken the proper steps, through the courts, to annul the sale.

Had the legislature of Illinois withheld action, or acquiesced in the sale, and *a fortiori*, had it confirmed the sale, the title of Delafield would have become good. Or had the bonds passed from Delafield to a *bona fide* holder without notice, the liability of the state would have been fixed. From 1868 to 1872 the state officials of South Carolina issued bonds under the various acts of the legislature, and placed them in the hands of the financial agent. In the management of these bonds these officials and the legislature not only acquiesced, but the latter body, as

the representatives of the sovereign people, in the validating act declared their issue regular and the bonds valid; and again, in the consolidation act, recognized them as valid obligations of the state.

In 1874, shortly after the funding had been commenced, under act of December 22d, 1873, the legislature was informed by Senator Dunn's committee that a large number of bonds in the hands of Kimpton had been hypothecated after the time allowed by law, and hence should not be consolidated, and that quite a number of coupons, tendered or about to be tendered for that purpose, were not valid against the state. The legislature took no measures to prevent the consolidation, and the attorney-general declined to interfere.

In March, 1875, in deliberating upon the address for the removal of Treasurer Cardoza, who was charged with issuing consolidation bonds for the securities which are *now* impeached, on the same grounds for which they were *then* assailed, the whole subject underwent a full investigation before the legislature. The address for his removal was rejected by the vote of the wisest members of that body, and he was directed to proceed to consolidate the outstanding bonds and coupons, which, it is now alleged, should not have been consolidated. Accordingly he did proceed, and issued in lieu of such vouchers a larger number of consolidated bonds than had been issued before; all holders of these securities being more willing to avail themselves of the act, because they regarded the result of this trial as putting all questions under the act as finally at rest. Taxes were promptly levied to pay the interest on the consolidated debt, and the interest was regularly paid up to January 1st, 1877.

In *Garrett* v. *Van Horne*, 7 *Ohio St.* 327; in *Burroughs on Taxation*, § 168, *et seq.*, and in other authorities and cases, the doctrine is laid down that payment of interest by taxation on bonds irregularly issued precludes defences denying the power to issue.

Again, the state received and enjoyed the proceeds of the sale and hypothecation of these bonds now impeached. Doubtless her officials and her financial agent did squander and misappropriate much of the money thus raised on bonds, but this is a matter between the state and her officers and agents, and cannot and ought not to affect the holders for value of her securities.

The " reconstruction " bonds and stocks authorized to be consolidated amount to $5,385,100; consolidated at fifty per cent. gives $2,692,550. From the proceeds of the bonds sold and hypothecated the financial agent raised $3,402,127.39, which exceeds the whole consolidated reconstruction debt by $709,577.39.

The consideration of these consolidation bonds was therefore good and valuable. Can the state, retaining the money, be admitted to impeach the bonds? A principal cannot repudiate the illegal acts of his agents and at the same time retain the benefit thereof. The state cannot now deny, nor could she at any time have denied, the right of her agent to pledge or to sell her bonds while holding on to the money raised thereon. An offer to return this money would be a condition precedent essential to any steps to repudiate or to annul the sale or hypothecation. This she has never offered, nor does she now propose to do so, and hence she must stand by these sales and pledges. So says the Supreme Court of the United States, in *Pendleton County* v. *Amy,* 13 *Wall.* 297.

The financial agent made a settlement with the state under and by virtue of an act passed for that purpose, and a balance was struck in his favor, showing over $134,000 to be due him, which was another significant act of acquiescence in and approval of his sales and hypothecation; and if he had any stolen coupons, clipped from bonds or otherwise, his right to them was recognized in this settlement.

By the consolidation act and its repeated endorsement and full acceptance, a final settlement and adjustment of all vexed questions touching the bond debt of the state was apparently effected; and, in the opinion of her best citizens, was attained with marked pecuniary advantages to the state. By this adjustment the debt was reduced to an amount less than existed prior to 1868. Of the morals of the mode of its reduction we are not to speak, but only of the fact. People in and out of the state were now freely and confidingly investing in these new securities. The consols were thrown upon the market, and the rich and poor, trustees, charitable institutions, and men of all avocations, purchased them, confiding in the good faith of the state pledged on the face of each bond, and the strong guarantees of the act.

That faith and that contract the law will not permit the state to violate for any of the insufficient reasons alleged in the defence of these suits.

The aforesaid acts of acquiescence, waiver and confirmation, in our judgment, estop the state, and preclude the defence she now sets up to these suits.

## II.

That the act of December 22d, 1873, creates a contract between the state and every holder of any of her securities named in that contract who has accepted the terms thereof, whereby, in consideration of mutual advantages, a composition of their claims was made which is final and conclusive. The third section of that act declares that the bonds and certificates of stock therein authorized to be issued " should bear upon their face the declaration that the payment of the interest and the redemption of the principal is secured by the levy of an annual tax of two mills upon the dollar upon the entire taxable property of the state, which declaration shall be considered a contract entered into between the state and *every holder* of said bonds and stocks."

The fifth section declares that " all coupons upon the bonds, and the interest orders of said certificates of stock herein authorized to be issued, shall be received in payment of all taxes due the state during the years in which they mature, except for taxes levied for the public schools."

That this legislation constitutes a contract which the state is not at liberty to violate is set at rest by repeated decisions of the Supreme Court of the United States.

The first is the case of *State of New Jersey* v. *Wilson,* 7 *Cranch* 164. In this case it is, as it was in the case of *Fletcher* v. *Peck* and in later cases, held that the clause of the constitution of the United States prohibiting states from passing bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, applies as well to contracts to which a state is a party as to contracts between individuals.

In *Woodruff* v. *Trapnall,* 10 *How.* 190, decided in 1850, it was held that the provision in an act of the legislature of Arkansas, chartering a bank that the bills and notes of the bank shall

be received in all payments of debts due to the state, constituted a contract between the state and the holders of these notes which the state was not at liberty to break.

In the case of *Furman* v. *Nichol*, 8 *Wall.* 44, decided in 1868, a similar decision was made as to the bills of a bank chartered by the legislature of Tennessee. A number of other cases from the same court might be cited in which analogous principles are held, but it is enough to refer to but a single other, and that is the case of *Wagner* v. *Stoll et al.*, from this state, in which the Supreme Court of the United States has made a like decision, touching a like provision in the charter of the bank of the State of South Carolina. 17 *Wall.* 425.

The consolidation act was an adjustment or compromise offered by the state to the holders of certain carefully-enumerated outstanding stock, bonds and coupons, that if they would surrender these securities to be canceled, the state would issue to them, in lieu thereof, at the rate of fifty cents on the dollar, new bonds with guarantees that did not attach to those surrendered, to wit, the guarantees set forth above, in Sections 3 and 5 of the act.

Each holder of one of the designated securities who accepted the terms of the act, thereby entered into a solemn compromise and firm contract with the state, founded upon a good and valuable consideration, and binding upon the state.

Of the securities thus invited to be surrendered, $4,051,527.35 consisted of old bonds and stocks, the validity of which was never questioned.

Of the conversion bonds, $5,965,000 were repudiated as void; but of the balance of the reconstruction debt, carefully enumerated by amounts and classes, in the act, aggregating $5,835,100, nearly if not quite all had been questioned, as has been shown, by suits in court, by acts of the legislature, reports of committees, and through the public press; and questioned, too, upon the grounds set forth in the report of the bond commission and in the answers to these suits. In this condition of doubt as to the ultimate determination of the questions involved, and with full knowledge of the facts, the act of December 22d, 1873, was passed, wherein the state proposed to her creditors therein enumerated the terms of compromise contained therein. The con-

sideration offered to the bondholders was a security, as was supposed and intended, unquestioned and unquestionable, with higher guarantees, at fifty cents on the dollar, in exchange for a security whose validity had been assailed.

The consideration moving the state was the reduction of her outstanding liabilities to less than one-third of its original amount.

The effect of the compromise was mutual gain to the parties in interest. The state gained in greatly reducing the volume of her debt, and the creditor gained in receiving a security of a higher grade, though less in amount, but of unquestionable validity. *Story Eq. Jur.*, §§ 129–131, and cases there cited; *Cann* v. *Cann*, 1 *P. Wms.* 727; *Stapleton* v. *Stapleton*, 1 *Atk.* 10; *Gibbons* v. *Count*, 4 *Ves.* 840; *Durham* v. *Waddlington*, 2 *Strob. Eq.* 258.

Other cases, equally as strong and perhaps more applicable, might be referred to and citations made therefrom did space permit. We enumerate some of them: *Ex parte Lucy*, 21 *Eng. L. & Eq.* 199; *Union Bank of Georgetown* v. *Geary*, 5 *Pet.* 99; *Barlow* v. *Ocean Insurance Company*, 3 *Met.* 270.

It makes no difference that we are dealing with a contract entered into by a sovereign state.

Contracts of states are measured by the same rule and governed by the same principles of law as control the compromises and contracts of private individuals. *Murray* v. *City Council of Charleston*, 96 *U. S.* 432.

The legislature had been informed of the several matters which, it was alleged, affected the validity of the coupons in question, and which were subsequently stated in the Dunn report; but, nevertheless, that body made no discrimination between the bonds and coupons, and the treasurer was required, under severe penalties, to consolidate *all coupons* maturing before January 1st, 1874, as well as the bonds to which they were attached or from which they had been clipped. In the work of consolidating these coupons the treasurer, in 1875, was interrupted by the aforesaid address for his removal, but the legislature, after mature deliberation, ordered him to proceed, and he did so.

The consolidation act is a compact and a compromise—a con-

tract between the state and the holders of bonds issued in exchange for vouchers enumerated in the act.

This contract the courts are bound to recognize and enforce; and any attempt at legislation designed to alter, vary or violate the same, would be in violation of Section 10, Article I., of the constitution of the United States.

### III.

These consolidation bonds are negotiable instruments, and in the hands of *bona fide* holders for value before maturity, if issued by competent authority, are unaffected by, and exempt from inquiry into, the .circumstances under which they were put in circulation. 2 *Dan. on Neg. Inst.*, § 1502.

States enjoy the rights and incur the liabilities of individuals when they deal in commercial paper, and such are these coupon bonds, so much so that in a recent New York case coupons are held to be entitled to days of grace.

In *Murray* v. *City Council of Charleston*, 96 *U. S.* 432, it is said : " When states and cities borrow money and contract to repay it with interest, they are not acting as sovereignties; they come down to the level of ordinary individuals; their contracts have the same meaning as similar contracts between private persons."

Under the law of commercial paper or negotiable instruments, we are at a loss to perceive how these consolidation bonds are obnoxious to any of the defences alleged against them by the state. If they were issued by competent authority, being negotiable instruments, they are in the hands of innocent holders for value before maturity and without notice, exempt from inquiry into the circumstances under which they were put in circulation. *City of Lexington* v. *Butler*, 14 *Wall*. 296.

Were they issued by competent authority? Did the treasurer who issued them have authority to do so, and bind the state thereby? If so, their validity cannot be questioned. The purchaser is not bound to look further than to ascertain this fact. He need trace the title no further than the act empowering and directing the treasurer to issue them.

In the Floyd acceptance cases, the United States escaped the

payment of the accepted drafts, solely upon the ground that Floyd had no authority to bind the government by the acceptances. The court says: "Recurring to the written law as the conclusive source of such authority, we may confidently assert that there is no express authority to any officer of the government to draw or accept bills of exchange."

But how is it in the case of these consolidation bonds? The treasurer is not only authorized to issue the bonds in lieu of certain designated securities upon their surrender, but is commanded to do so under severe penalties for refusal. This authority is clear and explicit, and is all that a purchaser of a consolidation bond would desire to see in investigating the title of a bond.

The bonds enumerated in *Schedule* 5 of the report of the bond commission, and acknowledged to be valid, were issued by the same agents, under the same law, and by the same authority as those in *Schedule* 6, which are alleged to be invalid, and the same officer of the state, under the same law, is continuing the work of consolidation. Should the purchaser of consolidation bonds see fit, however, to go further in his investigation of title, and examine the records of the treasury, he will there find that the bonds he intends to purchase were duly and regularly issued in exchange for vouchers expressly named in the act as proper to be exchanged. No higher proof of the validity of the bonds could be desired, and the purchase is accordingly made with the utmost confidence in its safety.

But, it is contended for the state, that although this be true, yet the securities exchanged are no securities at all, though named in the act; that they were really not binding on the state, and should not have been authorized by the act to be received in exchange for consolidation bonds. It is now too late to raise this objection. The state is estopped by the act. With great pains and accuracy the legislature designated the securities to be consolidated, and peremptorily commanded the treasurer to issue bonds in exchange therefor. This action, it must be remembered, was taken, in the face of the objections, against the securities to be funded, which are now so strenuously urged. The act leaves to the treasurer no discretion or option, but is mandatory, and imposes on that officer duties purely ministerial. So it cannot

now be objected that any of these bonds were issued without authority, or by an improper exercise of authority.

An improper exercise of authority could only occur in knowingly receiving in exchange for consolidation bonds, vouchers *not included* in the act. If, upon examining the act, he finds the securities tendered to be among those therein directed to be funded, his duty is to make the exchange. No discretion is left him. But suppose, by the terms of the act, the treasurer could act judicially and determine whether vouchers tendered, though named in the act, are valid or invalid. Clearly his judgment upon the question is final, as there is no appeal, and the consolidation bond issued by him becomes, in the hands of an innocent holder for value without notice, unimpeachable.

Should he err in his judgment, and issue a consolidation bond in exchange for invalid vouchers, how is that to impair the bonds in the hands of an innocent holder? Who is to be the loser, the state, who confided this work to its servant, or the innocent purchaser? Clearly the state must suffer. She, having conferred upon the treasurer authority to issue consolidation bonds, cannot, as against an innocent holder for value of her bonds, deny that the authority was conferred, or that it was properly exercised.

In *Knox* v. *Aspinwall*, 21 *How*. 540, the defence of the county against the suit of the plaintiff was, that the bonds were authorized to be issued only upon a vote of a majority of the voters of the county, after due notice of the time and place of the election, and that this due notice not having been given, the bonds were invalid.

The court holds that it was for the board to determine that question, and their decision could not be called in question "after the authority had been executed, the stock subscribed and the bonds issued and in the hands of innocent holders." *Page* 545. See, too, *Coloma* v. *Eaves*, 92 *U. S*. 48; *Bissell* v. *City of Jefferson*, 24 *How*. 288; *Moran* v. *Miami County*, 2 *Black* 722; *Mercer Co*. v. *Hacket*, 1 *Wall*. 83.

The same rule of law is laid down in *Meyer* v. *City of Muscatine*, 1 *Wall*. 393; *Gelphe* v. *City of Dubuque*, 1 *Wall*. 175; *Supervisors* v. *Schenck*, 5 *Wall*. 784; *Lynde* v. *County*, 16 *Wall*. 11; *Commissioners* v. *January*, 94 *U. S*. 205.

In *County of Dallas* v. *McKenzie*, the general doctrine is thus tersely stated : " A holder for value is not affected by any irregularities or frauds or unfounded assumptions of authority on the part of the agents of the town or county."

By an unbroken series of decisions this doctrine has become the settled law of negotiable bonds put in circulation by towns, cities, counties and states. It is a rule of law founded in the wisest views of public policy and of fairness and justice. With any other rule prevailing, these negotiable instruments would be valueless in the market, and municipal corporations would be unable to realize money on them. Through the whole series of authorities on this point, from the earliest to the latest, the doctrine is clearly and uniformly sustained that, when the authority to issue the bonds exists, and the holder is a *bona fide* holder for value, the bond is valid ; and that this rule of law is as applicable to bonds of states as to those of inferior municipal corporations.

The case of *State of California* v. *Wells, Fargo & Co.*, 15 *Cal.* 236, bears with peculiar force upon the issues here involved, and we propose to close the list of references on this branch of the cases in hand by free extracts from it.   *   *   *

Such is the sound reasoning of the court which adjudged the State of California liable for these bonds in the hands of a *bona fide* holder for value, though issued for warrants which had been stolen from the treasury.

Stolen negotiable paper in the hands of an innocent holder for value before maturity, and without notice, is a valid claim against the maker. This doctrine is a necessary incident to commercial paper, and is sustained by best authority. 2 *Pars. on Cont.* 118 ; 1 *Dan. on Neg. Inst.* 61.

Against the views above expressed the counsel for the state contend that the plaintiffs are not entitled to the protection which the law accords to innocent holders of negotiable paper, because there can be no such thing as an innocent holding of a void security which the law will protect, and that these bonds are *void*.

While it is true that a holder of a *void* security can derive no benefit from the fact that he became a purchaser for value before

maturity, and without notice, we cannot see that the doctrine is applicable to the present plaintiffs.

It has not been made to appear that any of the surrendered vouchers, in exchange for which consolidation bonds were issued, were *void ;* and, furthermore, consolidation bonds were not affected by any infirmities which may have attached to the securities which have been surrendered and canceled. By the compromise tendered in said act and accepted by the creditors of the state, the old bonds, coupons and certificates of stock have been delivered up and *canceled.* They are dead, and neither they nor questions appertaining to their validity can be resurrected. Thereby the state entered into a new contract, founded in a valuable consideration ; and its obligation she cannot, therefore, escape, by reviving issues from which the new contract is discharged and free. The state, therefore, in these suits, cannot avail herself of the doctrine that the law will not afford protection to the holders of said securities.

Before closing this branch of the case it may not be improper to notice a question pertinent to the rights of *bona fide* holders of these bonds. None of them, it seems, gave full value for them. They were purchased at prices varying with the fluctuations of the market. Are they entitled to set up these bonds against the state for their face value and interest? We hold that they are, and in support of this view we rely upon a recent decision of the United States Supreme Court settling this question in language clear, forcible, and consonant with sense and good law. *Cromwell* v. *County of Sac.,* 96 *U. S.* 60.

So far we have considered the questions involved in these cases as if the facts alleged by the state to establish infirmities in the vouchers, in exchange for which the consolidation bonds were issued, were true ; and have endeavored to show that even if such infirmities existed, they could not affect these bonds in the hands of the plaintiffs, who are innocent holders for value without notice and before maturity. The next inquiry is, whether the facts alleged by the state are sustained by proof, and whether the legal propositions advanced to impeach the bonds are well taken. The objections to the validity of these several bonds, both of fact and of law, set up in the several answers, are,

in the main, the same as are advanced in the report of the bond commission, and we propose to review them in the order therein set out.

The coupons embraced in objections 1, 2, 3 and 4 of the report, aggregate $837,246 ; and the charges in substance are, that these are coupons, some of which were clipped from bonds that were never issued, others from bonds before they were issued, and a large number were coupons that matured before January 1st, 1871, up to which date the state promptly paid all accruing interest, and therefore must have paid these coupons so maturing. Bearing upon this branch of the case much testimony was introduced, a part of which is hearsay in its character, to the admission of which counsel for the plaintiffs very properly objected. An examination of all the legitimate testimony, and in fact the hearsay as well, does not enable me to discover satisfactory proof of the facts alleged. We are asked to infer these facts from certain documentary evidence, and by a method of speculative reasoning adopted by the bond commission.

On examining that report (and the evidence on these trials is not so strong, because there is much there that is purely hearsay,) we are constrained to say that we cannot adopt some of these conclusions. A court of justice would not be warranted in rendering judgment upon hypotheses and conjectures, such as are indulged in by the commission.

We are constrained to say that the state has failed to furnish the court with sufficient proof of the allegations touching these coupons; and, as we have already seen, such is the law that the facts, if established, would avail her nothing. *State of California* v. *Wells, Fargo & Co., supra.*

Objection 5 is, that a large number of bonds, to wit, $2,166,-039, were hypothecated by the financial agent after the time allowed by law. After six months' patient investigation by the bond commission, with full power to receive and consider secondary evidence and hearsay testimony, and with access to and liberty to use the reports of previous investigating committees, the strongest allegation which the commission was able to make is, that " there is no evidence within the knowledge of the commission that these bonds, or any of them, had ever been pledged

within the time limited by law." In its most liberal construction, the evidence on this point adduced by the state amounts to no more, and falls short of proof. But the state having alleged that these bonds were not hypothecated within the lawful period, is bound to prove it.

It does not devolve upon the bondholders to prove that they *were* pledged within the time allowed, but it does devolve on the state to prove that they were not so pledged, before she can ask benefit from the allegation. But suppose the facts were so, was it not as competent for the legislature to ratify the pledge as for that body by act to extend the time in which to effect a loan, as it did by enlarging the time from twelve months to two years? And has not the hypothecation, whensoever made, been fully ratified?

The retention of the loan or proceeds of the pledge is the strongest act of ratification; but the validating act, the settlement with the financial agent, the consolidation act, and the action upon the charges against Cardoza, are all acts of ratification.

Does it lie in the mouth of the state retaining the proceeds of the hypothecation to set up this defence? We think not. But again, these hypothecated bonds could not be, or were not, redeemed, and being sold under forfeiture, passed into the hands of *bona fide* holders for value without notice. Surely, against their claim the state was without defence, as we have seen in *State of Illinois* v. *Delafield,* and other cases cited.

Objection 6 is that some of the vouchers, in exchange for which consolidation bonds were issued, are a part of the second issue of bonds under act of August 26th, 1868, " to negotiate a loan for the relief of the treasury," all of which second issue, the state alleges, were null and void, and should not have been consolidated.

A sufficient reply to this is, that the legislature thought otherwise, and so said expressly in the act of December 22d, 1873, in which the whole of the second issue then outstanding was directed to be consolidated. But looking at the act of August 26th, 1868, we see that, by its express terms, the governor was authorized to borrow, on coupon bonds of the state, within twelve

months from the passage of the act, $1,000,000. The amount to be borrowed is limited, and clearly the power is conferred to issue bonds until, by sale or hypothecation, that amount of money should be raised. The act can admit of no other interpretation than that the bonds could be issued and sold until $1,000,000 were realized, and of course the number of bonds necessary to this end would depend upon their market value.

The recital in the first $1,000,000 of bonds which were issued under this act being calculated to impair their market value, a second $1,000,000 was issued, with less prejudicial recitals, the object being to retire the first with this second issue. Much the largest part of the first issue was thus retired, and less of both were left outstanding than was sufficient to raise $1,000,000.

The next objection is against both issues of the land commission bonds, which the state alleges are void. She has received the proceeds of these bonds, and proposes to retain the same. She next has, by act of December 22d, 1873, forced the holders to surrender them and take consolidation bonds in exchange therefor at fifty cents on the dollar; and now gravely contends that these she is not liable to pay, because of alleged infirmities in the original.

The two grounds upon which the surrendered vouchers are assailed is, that the bonds were not issued to the land commission as required by the act; and, second, that they were sold below par.

Both objections are unavailing to invalidate the original land commission bonds, much less to avoid the payment of the bonds issued in consolidation thereof.

It is further urged that the scheme of the ordinance of the convention of 1868, providing for a land commission, has not been pursued by those charged with its execution. That ordinance was not binding on the legislature. The convention of 1868 was an extraordinary body, called in an extraordinary manner, by an extraordinary power, and for a special purpose, viz., to frame a constitution as a basis of reconstructing the state.

Beyond this special purpose it could not go. It possessed no legislative powers. This ordinance is legislative, and, never having been submitted to and ratified by a vote of the people, it

R

acquired not the sanction of a law, but, at most, could only be regarded as advisory. But the constitution of 1868 was so ratified, and so became the fundamental law of the land. By it alone the legislature is restricted. Its mandates and inhibitions must be obeyed. The bonds were issued under the act of the legislature, and not under the ordinance. The bonds, it is true, were not issued directly to the land commissioner, but by and with his consent and the advice of the advisory board, were placed in the hands of the financial agent of the state to be negotiated for the benefit of the land commission. The land commissioner got the proceeds and invested the same in lands, in the purchase of which atrocious frauds were doubtless perpetrated on the state. But she took the titles to these lands, many tracts of which she has sold to purchasers.

Gross irregularities are apparent in the management of this important matter, but these cannot avoid the bonds. Between the state and her dishonest agents these matters must be settled, and, if loss there be, it must fall upon the state rather than the purchasers of her bonds, who are innocent of the frauds practiced. All these irregularities were well known to the state's representatives before the passage of the consolidation act, in which all these outstanding land commission bonds were directed to be consolidated. Behind that act the state cannot now be admitted to go in her efforts to impeach these bonds. It makes no difference that the original bonds may have been sold below par. For this infirmity the old bonds in the hands of innocent holders could not have been impeached (*Illinois* v. *Delafield,* *supra*), and surely the consolidation bonds cannot be.

The next defence is that the various classes of bonds issued under the several acts above enumerated were put upon the market in violation of Article IX., Section 14, of the constitution, which requires that "a correct registry of all such bonds shall be kept by the treasurer, in numerical order, so as always to exhibit the number and amount. unpaid, and to whom severally made payable." This is evidently a mode of book-keeping prescribed by the constitution for the convenience and information of the state officials, and as a check and safeguard against the mischiefs that might result from less precaution. But its

observance or non-observance cannot and should not affect the validity of bonds issued by the state. It is a piece of clerical work which must necessarily follow and not precede the act of issuing the bonds. With it the bondholder has nothing to do, and should not be affected injuriously by a duty not his, and over which he can have no control.

But even in this allegation the state is not fully sustained. The journals of the treasury do show a registry of these bonds in most part, though not in the exact method contemplated by the constitution, arising from the fact that the bonds were not sold directly from the treasurer's office and to individual purchasers, in which event a detailed registry could and would have been kept, but they were issued *en masse* directly to the financial agent, and to him they were charged in perhaps the only method practicable. But this omission of duty, irregularity—if such it can be called—is, as well as all other irregularities, cured by the consolidation act. It is not a defect going to avoid the consolidation bonds.

The last defence of the state is that the acts of the legislature under which the various classes of surrendered vouchers were issued were not passed by the constitutional two-thirds vote of the general assembly, as required in Article IX., Sections 7, 10 and 14, of the constitution, and that the consolidation act, in so far as it attempts to make that a debt which before was void, is inoperative because not passed by a two-thirds vote.

This contention is *res judicata*. The Supreme Court of the state, in *Morton, Bliss & Co.* v. *Comptroller-General*, 4 S. C. 430, in August, 1873, before the act of December 22d, 1873, decided the first branch of this proposition against the state. In that judgment the court holds that the several acts under which the bonds were issued which have been subsequently consolidated, were passed by the constitutional two-thirds vote; until overruled by competent authority, this judgment is controlling. Rights which have been acquired under the law of that case cannot be divested now by its reversal. It would avail the state nothing, so far as these consolidation bonds are concerned, to obtain a reversal of that case; because both the state and bondholders

have acted upon it as good law, and have entered into a contract which its reversal cannot avoid.

The state issued various classes of bonds, and, throwing them upon the market, raised money by their sale and hypothecation.

Upon these bonds she paid interest, and the money raised upon them went into the treasury, or should have gone there.

By the consolidation act the state offered an inducement little short of compulsion to the bondholders to surrender them and receive well-guaranteed bonds, at half their full value, in exchange for those surrendered. Accordingly large surrenders have been made, and the vouchers now lie *canceled* in the treasury. Now she seeks to repudiate the new consols for alleged defects of the canceled vouchers, but makes no offer to restore the money she realized on these vouchers. Her defence does not stand the test of law. With its policy the court has nothing to do.

As to the defence that the consolidation act, for want of a two-thirds vote, is void in so far as it creates a debt by making that an obligation which before was not such, we cannot see the force of it. The act neither creates nor pretends to create a debt. It is, from beginning to end, a proposed scheme of settlement and compromise of the outstanding bond debt of the state, and, such being its avowed purpose—viz., " to reduce the volume of the public debt "—it needed not a two-thirds vote, and was constitutionally enacted.

We have considered the question of the validity of the bond in suit, as if we were a court having full power to consider and determine the whole question, the *entire matter at issue.* The question referred to us, and the one we are specially created to decide, is the validity of *certain classes of consolidation bonds,* and not consolidation bonds generally.

The interpretation of the text of the joint resolution creating this court by the majority of its members is, in my judgment, a misconception.

Its jurisdiction is defined in Sections 1 and 9, and appears to me to be free from ambiguity, and too plain to admit of debate. The two sections, when read together, mean nothing more nor less than that the court is created to determine the validity, not

of consolidation bonds in general, but only those classes of them reported to be invalid by the bond commission.

Surely there is no room to misunderstand the meaning of this language. It gives to the court unlimited jurisdiction to determine the validity of those consolidated bonds, coupons and certificates of stock which the bond commission mention as resting on vouchers which were not issued in accordance with law, and which bonds, coupons and certificates of stock the bond commission arranged and tabulated in *Schedule* 6.

It is clear that the joint resolution creates a special court for a special purpose, and that is to determine the validity of a well-defined class of consolidated bonds, viz., those pronounced by the bond commission to be invalid, and classed in *Schedule* 6 of their report. Beyond this limited sphere the court cannot go; but for the purpose of deciding the validity of those particular bonds, its powers are as ample and plenary as the Court of Common Pleas. There is absolutely no restriction of power within this limit. It is true the court is empowered and required to suffer the litigants to bring before it the vouchers upon which the consolidated bonds rest. This makes evidence touching these vouchers expressly admissible, when otherwise it might not have been so. But making it admissible does not take from the court the power and duty to determine its ultimate effect upon the single question at issue, to wit, the *validity* of the *consolidated bonds*.

I am at a loss, therefore, to understand how the court has arrived at so strange a conclusion as is announced in its judgment. That conclusion is that we are appointed to determine *not the validity of the consolidation bonds,* coupons and certificates of stock, but the *validity of the vouchers upon which they rest;* and that if those vouchers are found to be *invalid,* we are compelled, by the terms of the joint resolution, to declare the bonds resting on them to be invalid. In other words, that if we possessed the general jurisdiction of the Court of Common Pleas, we might go further, and determine the validity of consolidation bonds, although resting on invalid vouchers, and would be at liberty to pronounce them valid, notwithstanding infirmities in the vouchers. But no such power, it is contended, is accorded this court, which, should it find the vouchers invalid, is *ex vi*

*termini* of the joint resolution, precluded from further inquiry into the validity of the consolidation bonds resting thereon.

If this be the correct interpretation of the language of the legislature, the whole work of that body and the labors of the attorneys for the litigants and of this court are abortive. It leaves the main question, the one which perplexed the legislature, and which underlies this great public debt question, untouched, to wit, the legal effect of the consolidation act upon the bond debt of the state.

Furthermore, it leaves the bondholders entirely free to renew this contention in a court which will take cognizance of the question of the validity of the consolidation bonds.

I am constrained to differ with my brethren in the construction placed upon the joint resolution, and to dissent from the judgment of the court in the aforesaid test cases, for the reasons above given. And I hold that each of the bonds sued on is a valid obligation of the State of South Carolina, as is every bond issued in exchange for vouchers expressly named in the act of December 22d, 1873.

Suppose the debate upon the report of the bond commission had resulted in a proposed compromise of the consolidated bonds, coupons and certificates of stock designated and described in *Schedule* 6, and that the holders of these consols, accepting the terms of the compromise, had surrendered them and received new consols at a further reduced amount.

Would any man contend that the compromise was not binding on the state? Could the new consols, the fruit of such a compromise, be successfully resisted by the state in a court of justice? We hold not; and yet the present consolidated bonds occupy ground just as unassailable. They are valid obligations of the state, and their payment she cannot avoid on any recognized principles of law. She may escape through repudiation, but the law will lend her no helping hand in this last desperate resort.

Could South Carolina be honorably discharged from this heavy debt and all others that burden her impoverished people, no one would rejoice more than I would. I have, throughout this trial, keenly felt the heavy responsibility resting upon me,

and have endeavored to discharge my duty as a judge with an eye single to the law governing the case.

Better by far that the state should suffer through a proper vindication of the law by her courts than that temporary relief should accrue to the taxpayers through its perversion; and if relief shall come to her people through the judgment of those with whom I have, with much diffidence and great respect, differed, I will be most happy to acknowledge my error when demonstrated before the court of last resort.

I greatly regret that the court has so construed the joint resolution as to eschew and ignore the only question which can settle the issue between the state and the holders of her consolidated bonds, viz., the force and effect of the consolidation act, and has confined itself to the simple inquiry as to the infirmities of the surrendered and canceled vouchers.

It leaves the vexed question of the validity of the bonds in *Schedule* 6 *res integra.*

The plaintiffs appealed to this court, when these cases were argued upon the several points made in the court below.

*Messrs. James Conner, Simonton & Barker, C. R. Miles, Lord & Inglesby,* and *W. H. Brawley,* for appellants.

*Messrs. L. F. Youmans,* Attorney-General, *Henry Meetze* and *Y. J. Pope,* for the state.

September 29th, 1879. The opinion of the court was delivered by

, McIVER, A. J. For a proper understanding of the questions raised by this appeal, as well as to show how it is that these actions are brought against the state in one of her own tribunals,

---

* The Reporter has not been supplied with the arguments of all the counsel engaged on both sides. Those which he has are very able and exhaustive, but are necessarily omitted for want of space, as they are long, and no considerable abridgment of them can be made without doing the learned counsel injustice. They do not seem to be necessary to a full understanding of the points made.—REPORTER.

it will be necessary to make a brief statement of the legislation which gave rise to the cases.

On the 8th of June, 1877, (16 *Stat.* 318), the general assembly adopted a joint resolution, which, after reciting that "great uncertainty" existed in the minds of the taxpayers as to the real amount of the valid indebtedness of the state, provided for the appointment of a commission, consisting of three members of the senate and four members of the house of representatives, whose duty, in general terms, it should be to investigate and report upon such indebtedness. This commission, which, for convenience, will be called, as it is usually designated, the bond commission, were, amongst other things, specially directed to inquire and report: *First.* What was the entire amount of consolidated bonds and certificates of stock which had been issued under the provisions of an act entitled "An act to reduce the volume of the public debt and provide for the payment of the same," approved December 22d, 1873, (15 *Stat.* 518), which act will be called throughout this opinion the consolidation act. *Second.* "Whether there is, in the state treasurer's office, on file as vouchers, canceled bonds, coupons and certificates of stocks of the issues described, issued in accordance with law and authorized to be consolidated by the act above recited, to the amount required by said act." These duties involved, therefore, the institution of four inquiries: *First.* What was the entire amount of consolidation bonds and stocks issued? *Second.* Whether there were vouchers in the treasurer's office in the shape of canceled bonds, coupons and certificates of stock for which the consolidation bonds and stocks were issued, to the amount required by the terms of the consolidation act? *Third.* Whether such vouchers—canceled bonds, coupons and certificates of stock—had been issued in accordance with law? *Fourth.* Whether such canceled bonds, &c., were amongst those which were authorized to be consolidated by the terms of the consolidation act? For, it will be remembered, that the bonds, coupons and certificates of stock authorized to be consolidated are specifically mentioned in that act, while others are not mentioned at all; and others again, a very large proportion—nearly all, in fact—of the conversion bonds, are specially

excepted from the operation of the act, because they were issued
" without any authority of law."

In due time the bond commission submitted an elaborate re-
port, accompanied with various schedules—that called *No.* 6
being intended to represent the consolidation bonds and certifi-
cates " affected by vouchers which, in the judgment of the bond
commission, were not issued in accordance with law and author-
ized to be consolidated under the act to reduce the volume of the
public debt and provide for the payment of the same." There-
upon the general assembly, without either affirming or disaffirm-
ing the conclusions of the bond commission, so far as the validity
of the bonds and stocks mentioned in *Schedule No.* 6 were con-
cerned, passed a " joint resolution providing a mode of ascertain-
ing the debt of the state and of liquidating and settling the
same." *March* 22*d*, 1878, 16 *Stat.* 669. That resolution, in its
first section, provides for the establishment of a Court of Claims,
which " shall have jurisdiction to hear and determine any case
or cases made up or brought to test the validity of any of the
consolidated bonds, coupons and certificates of stock, or of any
of the various classes of them, mentioned in the said report of
the bond commission as resting on vouchers not issued in accord-
ance with law and authorized to be consolidated by the act of the
general assembly, approved December 22d, 1873, entitled 'An
act to reduce the volume of the public debt and provide for the
payment of the same,' and, also, as not issued in accordance with
law, and further designated and described in *Schedule* 6 of said
report.   In Section 9 it is provided " that the attorney-general
and his said associates, with the consent of the creditors of this
state, or so many of them as shall be necessary, may make up a
case or cases to be heard and determined in said court, in which,
if practicable, the state shall be defendant, to test the validity of
the said consolidated bonds and coupons and certificates of stock
mentioned in said *Schedule* 6, bringing before the court the
various classes of vouchers which, it is alleged in the report of
the said commission, impair the validity of the said consolidated
bonds, coupons and certificates of stock, or any of them."   The
tenth section directs " that there shall be levied for the current
fiscal year a tax sufficient to pay the coupons and interest orders

maturing on the outstanding consolidation bonds and certificates
of stock during the said fiscal year." The eleventh directs the
payment of such interest on those consolidation bonds and certifi-
cates of stock mentioned in *Schedule* 5 as are subject to no valid
objection, and then Section 12 provides for the payment of the
interest for that and the preceding fiscal year on the several
classes of consolidation bonds and certificates of stock mentioned
in *Schedule* 6, " whenever there shall be a *final* adjudication as to
the validity of the several classes of bonds and certificates of
stock *in the manner hereinbefore provided, and none other.*" In
pursuance of the provisions of this resolution, the cases which we
are now called upon to determine, being actions on coupons of
the various classes of bonds mentioned in said *Schedule* 6, were
brought before the Court of Claims, and the majority of that
court have rendered their judgment in favor of the state, from
which these appeals have been taken to this court, as provided
for in the second Section of the said joint resolution.

The judgment of the Court of Claims is based upon a con-
struction of the provisions of the joint resolution constituting it,
by which they hold that their jurisdiction is limited to the in-
quiry, " Were the vouchers—that is, the canceled bonds, coupons
and certificates of stock—issued in accordance with law and au-
thorized to be consolidated by the act of the general assembly,
approved December 22d, 1873 ?" But they carefully avoid the
inquiry, as not, in their judgment, within the scope of their
jurisdiction, whether, assuming this to be so, the bonds and cer-
tificates of stock issued under the provisions of the consolidation
act, are, nevertheless, valid or invalid ; or, to use their language,
whether " the consolidation bonds issued under the act of 1873
are valid or invalid in other respects." It is very clear, from
the grounds upon which that court base their conclusions, that
they use the words " not in accordance with law," not in the
sense that there was no act of the general assembly authorizing
the issue of the bonds in question, but that the various provis-
ions of the acts authorizing their issue were not complied with,
and for that reason they were not issued " in accordance with
law." But, as we shall see, the real question in these cases is,
whether there were any acts authorizing the issue, and that

whether the bonds were issued in accordance with the various provisions of such acts, is a question comparatively unimportant. An act may fully authorize the issue of bonds, and yet the bonds may not have been issued in strict conformity to the provisions of such act—" not in accordance with law." Hence, the fundamental inquiry is, has the power to issue the bonds been conferred? not whether such power has been exercised " in accordance with " the various provisions of the law conferring the power.

We think it plain that the object of the resolution was to provide for " a *final* adjudication " of the vexed question as to what was the real debt of the state, and not simply to institute an inquiry into the consideration of that which purported to be such debt; for it is too plain a principle of law that a negotiable security—to which class it will be seen the bonds in question belong—whether issued by a private individual, a corporation, or a state, may constitute a valid debt, even though originally based upon an insufficient or fraudulent consideration, or upon no consideration at all, to suppose that any one, much less the legislature which passed this resolution, could be ignorant of it. Hence, when the declared object of the legislature, as evidenced by the title of the resolution, was to provide " a mode of ascertaining the debt of the state, and of liquidating and settling the same," we cannot suppose that they intended that the investigation should stop half way, but that it should be complete and thorough—that the *debt* should be ascertained, and not simply the nature of the consideration upon which it rested. And as this investigation was referred to a judicial tribunal, the necessary inference is that the object was to submit the question to the test of legal principles. But, in addition to this, the express terms of the resolution leave no doubt in our minds as to the real intention. In the first section the Court of Claims is invested with jurisdiction to hear and determine any case brought " to test the validity," not of all the consolidation bonds, &c., but only of such of them as are " mentioned in the said report of the bond commission as resting on vouchers not issued in accordance with law." Now, the validity of these bonds could not be tested by limiting the inquiry, as the Court of Claims have done, to the

question whether the vouchers—the canceled bonds, &c.—were issued in accordance with law; for it may be, as we shall presently see, that such vouchers are liable to all the objections alleged against them in the judgment of the Court of Claims, and yet the consolidation bonds may still be valid debts of the state. It seems to us that the construction which the Court of Claims have placed upon the words "as resting," in the first section of the resolution, is altogether inadmissible, and that those words are used merely for the purpose of indicating a particular class of bonds whose validity is to be tested. For it will be remembered that while the objection urged by the bond commission to much the larger part of the bonds, &c., mentioned in *Schedule* 6 is because they were issued in exchange for bonds, coupons or stock which, though embraced within those mentioned in the consolidation act, were yet illegally consolidated, because they were not issued in accordance with law, the additional objection is made to others because they were issued in exchange for bonds, coupons or stock which were not embraced within those mentioned in the consolidation act. Hence, in the first section of the resolution provision is made for testing the validity not only of that class of bonds which is subject to the first objection, but also of that class of bonds which is subject to the second as well as the first objection, so as to insure the consideration of both objections. But were there any doubt, the provisions of the ninth section demonstrate that the construction which we have adopted is the correct one. In that section the attorney-general and his associates are directed to make up a case. What for? Not to try the question whether the vouchers upon which the consolidation bonds rest were issued in conformity to the provisions of the several acts authorizing their issue, but "to test the validity of the said consolidated bonds and coupons and certificates of stock mentioned in *Schedule* 6 ;" and certainly the additional words contained in that section— "bringing before the court the various classes of vouchers which it is alleged in the report of the said commission impair the validity of the said consolidated bonds, coupons and certificates of stock, or any of them"—cannot have the effect of either enlarging or contracting the issue which the cases were made up to

try. The only object of these additional words was to instruct the attorney-general and his associates to see to it that the grounds upon which the consolidation bonds had been assailed in the report of the bond commission should be brought fully before the court which was specially constituted to try the above-stated issue, and perhaps to provide that these vouchers should be competent evidence upon such trial. To make the matter still clearer, the legislature proceeded, in the tenth section, to direct the levy of a tax sufficient to pay the interest on all the consolidation bonds, &c.; and in the twelfth section provided that the interest on the bonds, &c., mentioned in *Schedule* 6 should be paid "whenever there shall be a *final* adjudication as to the validity of the said several classes of bonds and certificates of stock *in the manner hereinbefore provided and none other*." This language would seem to place it beyond dispute that it was intended to invest the Court of Claims with full jurisdiction to make "a *final* adjudication" (subject only to appeal, as provided in the resolution,) of all questions touching the validity of the consolidation bonds, and that when such adjudication was made no question as to the validity of such bonds should remain open; but if such adjudication was in favor of the bonds, then the interest thereon was to be paid. Now, as under the construction adopted by the Court of Claims some of these questions were left open and undecided, it is very clear to our minds that such construction was not the proper one.

In reviewing the judgment of the Court of Claims two general questions present themselves: *First*. Are the conclusions announced in that judgment as to the existence of the several infirmities alleged against the several classes of vouchers well founded? *Second*. If they are well founded, does it follow that the consolidation bonds, &c., resting in whole or in part upon such vouchers, are invalid and not binding obligations of the state? But, from the view which we take of this case, it will only be necessary for us to consider the second question, as the answer to that will be conclusive of the result in the cases now before the court.

But for the fact that a different view has been suggested from a source which we have always been accustomed to treat with

the highest respect, we would have deemed it scarcely necessary to say that in the consideration of this question we are bound to regard the constitution of 1868 as the fundamental law of the state, and that all acts of the general assembly passed since its adoption, not in violation of any of its provisions or those of the constitution of the United States, are just as valid 'and of the same binding force and effect as any other statute passed at any other period of the history of the state. Any other view would be in violation of the fundamental principles upon which all republican governments rest, and would lead to inextricable confusion, and perhaps to civil commotion and strife. Without undertaking to inquire into the mode and manner by which the constitution of 1868 was adopted, it is enough to say that the people of the state have for years acquiesced in it, and treated it as the fundamental law of the state. The whole machinery of the state government was framed and is now operating under the provisions of that constitution. The very investigation which led to the framing of the cases now before the court was set on foot by a legislature elected in pursuance of its provisions. The Court of Claims, whose decision we are called upon to review, and this court itself, were both organized under and owe their authority to the constitution of 1868. It is manifest, therefore, that we are bound to regard that constitution as the fundamental law of the state, and all acts passed in pursuance of its provisions, as of the same binding force and effect as any that may be found on the statute-book passed prior to the adoption of that constitution. As Taney, C. J., says, in the case of *Luther* v. *Borden*, 7 *How.* 40: "Judicial power presupposes an established government capable of enacting laws and enforcing their execution, and of appointing judges to expound and administer them. The acceptance of the judicial office is a recognition of the authority of the government from which it is derived; and if the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it. And if a state court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and· displaced by an opposing government [or was an' usurpation, as seems to be contended for by

one of the judges of the Court of Claims], it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try.    If it decides at all as a court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power."

The legal principles which determine the answer to the question which we are called upon to solve are few in number, and are well established.   It is manifest that the question depends upon the inquiry whether the state has, by a valid contract, bound itself to pay the amounts which the consolidation bonds in question purport to secure; for though the action in each of the cases is upon a coupon of one of such bonds, it may be regarded, and, for convenience, will be spoken of in this opinion, as if the action were upon the bond itself—the legal principles involved being alike applicable to an action on a coupon as on a bond.    *State* v. *Spartanburg and Union Railroad Company*, 8 *S. C.* 163, recognizing *City of Kenosha* v. *Lamson*, 9 *Wall.* 483, and *City of Lexington* v. *Butler*, 14 *Wall.* 296.

Now, as the Supreme Court of the United States has uniformly held that, while they will, as a general rule, regard the construction given by state courts to state legislation and state constitutions as conclusive, such rule is subject to this exception; that where the question involved is not only whether such legislation impairs that which is admitted to be a contract, but whether that which is alleged to be a contract, is, in fact, a contract; (*State Bank of Ohio* v. *Knoop*, 16 *How.* 369; *Jefferson Branch Bank* v. *Skelly*, 1 *Bla.* 436; *Gelpcke* v. *Dubuque*, 1 *Wall.* 203; *Township of Pine Grove* v. *Talcott*, 19 *Wall.* 666;) and as the general assembly, in providing for this investigation, has, in express terms, recognized the right of the parties to invoke the judgment of this tribunal of last resort, it becomes important to examine the question in the light of the decisions of the Supreme Court of the United States.

There can be no doubt but that coupon bonds, like these under consideration, as well as the coupons thereof, are negotiable securities, and, as such, are subject to the same rules of law as govern that class of securities.    *White* v. *Vermont R. R. Co.*, 21 *How.* 575; *Mercer County* v. *Hackett*, 1 *Wall.* 83; *Cromwell* v.

*County of Sac.*, 96 *U. S.* 57; *Langston* v. *S. C. R. R. Co.*, 2 *S. C.* 248.

There is as little doubt that states which issue negotiable paper incur the same responsibilities which attach to individuals or corporations in like case. *United States* v. *Bank of Metropolis*, 15 *Pet.* 392; *Murray* v. *City Council*, 96 *U. S.* 445; *Floyd Acceptances*, 7 *Wall.* 666. As is said in the last-named case, "it must be taken as settled that when the United States becomes a party to what is called commercial paper—by which is meant that class of paper which is transferable by endorsement or delivery, and, between private parties, is exempt in the hands of innocent holders from inquiry into the circumstances under which it was put in circulation—they are bound, in any court to whose jurisdiction they submit, by the same principles that govern individuals in their relations to such paper."

That the plaintiffs in these cases, as well as the holders of the coupons for which the bonds here in question were exchanged, are entitled to be regarded as *bona fide* holders before maturity, and entitled to all the rights incident thereto, we do not think can be questioned, as there is no proof to the contrary—at the very utmost, only suspicion. The rule upon this subject, as stated by Mr. Justice Swayne in the case of *San Antonio* v. *Mehaffy*, 96 *U. S.* 314, upon the authority of 2 *Pars. on Bills and Notes*, 9, and *Pinkerton* v. *Bailey*, 8 *Wend.* 600, is that "the holder of commercial paper, in the absence of proof to the contrary, is presumed to have taken it under-due for a valuable consideration, and without notice of any objection to which it was liable;" and, as is said by Mr. Justice Field in *Cromwell* v. *County of Sac.*, 96 *U. S.* 57–8, in speaking of similar obligations issued by municipal corporations, "they are transferable by delivery, and, when issued by competent authority, pass into the hands of a *bona fide* purchaser for value before maturity, freed from any infirmity in their origin. Whatever fraud the officers authorized to issue them may have committed in disposing of them, or however entire may have been the failure of the consideration promised by parties receiving them, these circumstances will not affect the title of subsequent *bona fide* purchasers for value before maturity or the liability of the municipalities. As

with other negotiable paper, *mere suspicion that there may be a defect of title in its holder, or knowledge of circumstances which would excite suspicion as to his title in the mind of a prudent man, is not sufficient to impair the title of the purchaser. That result will only follow where there has been bad faith on his part.* Such is the decision of this court, and substantially its language, in the case of *Murray* v. *Lardner*, 2 *Wall*. 110." This is a very strong case upon the subject. The facts, in brief, were these : Negotiable bonds were stolen from Lardner and sold to Murray, a broker in New York, under circumstances well calculated to excite his suspicion, though there was no proof of any actual guilty knowledge on his part—the complaint against him being that he did not prosecute the inquiry which such circumstances of suspicion naturally suggested. The court, after an elaborate review of the English cases, held that he was not bound to do so ; that the possession of negotiable paper is presumptive proof of good title, and the burden of proof is upon him who assails the right claimed by the party in possession, and laid down the rule in very much the same language as that above quoted, declaring it to be settled law, from which there was no disposition to depart.

If, then, the bonds here in question are negotiable securities and the holders thereof are *bona fide* holders, our next inquiry will be as to the rule governing that class of securities in the hands of such holders. The rule, as stated by one of the most recent writers on this branch of commercial law, is that if such securities are issued by competent authority, they are, in the hands of such holders, unaffected by, and exempt from inquiry into, the circumstances under which they were put into circulation. 2 *Dan. on Neg. Inst.*, §§ 1502–3. Now, as corporations or states issuing such paper must necessarily do so through the instrumentality of officers or agents, the only inquiry in such cases is, whether the officer or agent has been entrusted with authority to make and issue the paper, and it is not competent to inquire into his conduct in making the issue. If he has been guilty of irregularities or even frauds in exercising the power with which he has been entrusted, the loss thereby occasioned must fall upon the party who entrusted him with such power, and not upon the

S

innocent holder, who has taken the paper in the usual course of trade. The rule, as stated in *Supervisors* v. *Schenck*, 5 *Wall.* 784, is: "When a corporation has power, under any circumstances, to issue negotiable securities, the decision of this court is that the *bona fide* holder has a right to presume they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached for any infirmity in the hands of such holder than any other commercial paper." And this rule has been re-affirmed in the recent case of *San Antonio* v. *Mehaffy*, 96 *U. S.* 314, and again in the still more recent case of *County of Macon* v. *Shores*, 97 *U. S.* 278–9. In the case of *Commissioners of Knox County* v. *Aspinwall*, 21 *How.* 545, it was held that where bonds have been issued by the board of county commissioners, under the authority of an act of the legislature, which prescribed certain conditions upon which the bonds were to be issued, "the purchaser of the bonds had a right to assume that the vote of the county, which was made a condition to the grant of the power, had been obtained, from the fact of the subscription by the board to the stock of the railroad company and the issuing of the bonds. The bonds, on their face, import a compliance with the law under which they were issued. 'This bond,' we quote, 'is issued in part payment of a subscription of $200,000 by the said Knox county to the capital stock, &c., by order of the board of commissioners,' in pursuance of the third section of act, &c. The purchaser was not bound to look further for evidence of a compliance with the conditions to the grant of the power." In the comparatively recent case of *Coloma* v. *Eaves*, 92 *U. S.* 490, the foregoing case is characterized as a leading case upon the subject, and is said to have established two propositions. *First.* "That the issue of the bonds containing a recital that they were issued under and in pursuance of the legislative act, was a sufficient basis for an assumption by the purchaser that the conditions on which the county (in that case) was authorized to issue them had been complied with, and that the purchaser was not bound to look further for evidence of such compliance, though the recital did not affirm it." *Second.* That "where legislative authority has been given to a municipality, or to its officers, to subscribe for the stock of a railroad company,

and to issue municipal bonds in payment, but only on some precedent condition, such as a popular vote favoring the subscription, and where it may be gathered from the legislative enactment that the officers of the municipality were invested with power to decide whether the condition precedent has been complied with, their recital that it has been, made in the bonds issued by them and held by a *bona fide* purchaser, is conclusive of the fact and binding upon the municipality." In *Coloma* v. *Eaves*, it is said that the first proposition has been re-affirmed in the cases of *Moran* v. *Miami County*, 2 *Bla.* 732; *Mercer County* v. *Hacket*, 1 *Wall.* 83; *Supervisors* v. *Schenck*, 5 *Wall.* 784; and in *Meyer* v. *Muscatine*, 1 *Wall.* 384, and, though doubted and dissented from by individual judges, has never been overruled. But, so far as the second proposition is concerned, it is said that it " has been so firmly seated in reason and authority that it cannot be shaken." This case has been repeatedly recognized and affirmed in a number of subsequent cases, among which may be mentioned *Marcy* v. *Oswego*, 92 *U. S.* 637; *Humboldt* v. *Long*, 92 *U. S.* 642; *Commissioners* v. *Bolles*, 94 *U. S.* 104; *County of Warren* v. *Marcy*, 97 *U. S.* 96. That the effect of these decisions is to reaffirm both of the propositions laid down in *Knox County* v. *Aspinwall*, is made manifest by what is said in the dissenting opinion of Mr. Justice Bradley in *Coloma* v. *Eaves*, 92 *U. S.* 493, and in the dissenting opinion of Mr. Justice Miller in *Humboldt* v. *Long*, 92 *U. S.* 649. We think, therefore, that the result of the cases in the Supreme Court of the United States clearly is, that when an act of the legislature authorizes the issue of bonds by a municipal corporation upon certain conditions therein named, and the bonds are issued by the proper officers of such corporation, containing a recital that they are issued under the authority conferred by such act, that such recital is conclusive in favor of a *bona fide* holder—that all the necessary conditions named in the act have been complied with, as a purchaser is not bound to look beyond the legislative act and the recitals contained in the bonds. As was said in *Marcy* v. *Oswego*, 92 *U. S.* 641, " the subsequent issue of the bonds containing the recital above quoted—that they were issued ' by virtue of, and in accordance with,' the legislative act, and in 'pursuance of, and

in accordance with, the vote of three-fifths of the legal voters of the township'—was another determination, not only of the result of the popular vote, *but that all the facts existed which the statute required in order to justify the issue of the bonds.*" The case of *Weith and Arents* v. *City of Wilmington,* 68 *N. C.* 24, which seems to be much relied upon by the counsel for the state, does not seem to us to be in conflict with the foregoing views; for in that case there was an absolute lack of power to issue the bonds which were there brought into question, and they were, therefore, properly held to be absolutely void even in the hands of a *bona fide* holder. The act under which the bonds were issued only authorized their issue in exchange for outstanding *valid* debts of the state, and as it was conceded that the original bond in exchange for which they were issued was given for money advanced in aid of the rebellion, which class of debts had been declared by the constitution of that state to be absolutely void, there was, of course, no authority whatever for the issue of the bonds in question.

It is true that the cases which establish the foregoing principles arose upon bonds issued by municipal corporations; but if, as we have seen, negotiable bonds issued by states are subject to the same rules which govern that class of paper when issued by individuals or corporations, it is difficult to conceive how this can make any difference—and, indeed, it seems to be conceded in the argument on both sides that there is no distinction. The rule grows out of the principles which apply to that class of paper, and is in no wise dependent upon the character of the parties who make or issue such paper.

There is, however, a very strong case in which these principles were applied to bonds issued by a state. *California* v. *Wells, Fargo & Co.,* 15 *Cal.* 236. In that case certain warrants which had been issued by the proper authorities of the state were paid and deposited in the office of the state treasurer. The warrants were afterwards stolen and presented to the treasurer to be funded under the provisions of an act entitled " An act to provide for paying certain equitable claims against the state." Bonds were issued in exchange for the stolen warrants, the treasurer at the time not knowing that they had been stolen. Sub-

sequently discovering this fact, he demanded the surrender of the bonds, and, upon refusal, brought this suit. There was no allegation or proof that the defendants knew the facts showing the fraud. It was held that, the warrants being negotiable paper, the bonds issued in exchange for them were valid debts in the hands of innocent holders, as the defendants were declared to be, in the absence of any proof to the contrary.

The practical question, then, in these cases is, were the bonds in question issued by competent authority? As the bonds purport to be the bonds of a state, and as a state cannot, like an individual, directly make and issue a bond, but must do so through the instrumentality of its officers or agents, who can only act under special authority conferred upon them, the inquiry in these cases is narrowed down to the question whether such authority was conferred upon the officers who issued the bonds in question. This authority, under the constitution of the state, could only be conferred by an act of the general assembly passed in conformity to the provisions of that instrument. Hence, it is not sufficient to show that an act of the general assembly has been passed authorizing the issue of such bonds, but it must also appear that such act is not subject to any constitutional objection. *Town of South Ottawa* v. *Perkins*, 94 *U. S.* 260; *Harshman* v. *Bates County*, 92 *U. S.* 569. Which, though overruled by the case of *Cass County* v. *Johnston*, 95 *U. S.* 360, as to the point that the act there in question was unconstitutional, may yet be regarded as authority for the proposition that if the act conferring the power to issue the bonds is unconstitutional the issue of such bonds will be without authority, and the bonds, even in the hands of a *bona fide* holder, will be invalid. So, too, if, by a proper construction of the terms of the act, the authority to issue the bonds is not conferred, the bonds will be invalid in the hands of a *bona fide* holder. As, for example, in the case of *Marsh* v. *Fulton County*, 10 *Wall.* 676, where the act authorized the issue of bonds to one railroad corporation and the bonds in question were issued to another corporation, which, though a portion of the first-named corporation, was held to be a distinct and separate corporation; and in the case of *Town of East Oakland* v. *Skinner*, 94 *U. S.* 255, where the charter of a railroad

corporation provided that "it shall be lawful for all persons of lawful age, or *for the agent of any corporate body* to subscribe any amount to the capital stock of said company," and it was held that the words "agent of any corporate body" applied only to private corporations, and did not, therefore, authorize a municipal corporation to subscribe for stock and issue bonds in payment therefor, and such bonds were, therefore, invalid, even in the hands of a *bona fide* holder.

The bonds, the validity of which we are called upon to inquire into, all purport to be bonds issued under the provisions of the consolidation act in exchange for coupons or other bonds called vouchers, purporting to have been previously issued under various acts of the general assembly, which will hereinafter be more particularly mentioned, and it is conceded that in every instance except one—that of the case of G. M. Walker, cashier—the vouchers were amongst those mentioned in the consolidation act, the bond in the case of Walker, cashier, being admitted to rest in part upon a batch of some $9000 of coupons detached from bonds for relief of the treasury, which are not included in the bonds of that class mentioned in the consolidation act. It is likewise conceded that the consolidation act was not passed "by the vote of two-thirds of the members of each branch of the general assembly," and was not submitted to a vote of the people, as is required by Article 16 of the constitution, adopted January 29th, 1873, (15 *Stat.* 466,) where after that time the general assembly undertakes "to create any further debt or obligation" on the part of the state. It cannot, therefore, be allowed the effect of creating "any further debt or obligation," and must be regarded as simply a scheme for the re-adjustment of the *then existing* debt. When, therefore, a question arises as to the validity of any bond which purports to have been issued under the provisions of that act, the inquiries are: 1. Was the debt for which such bond was issued a *then existing* debt of the state? 2. If so, was such debt amongst those provided for by the terms of the consolidation act? The answer to the first inquiry depends upon the answer to the question whether the "vouchers," which were surrendered upon the issue of the consolidation bonds now in question, were made and issued by competent authority. These

vouchers, in the cases now before the court, consist of coupons of bonds of various classes, which, for convenience, may be designated as bonds for relief of treasury—bonds for funding bills of the bank of the state—bonds for the payment of interest on the public debt, first issue—bonds for redemption of bills receivable —conversion bonds—bonds for payment of interest on the public debt, second issue—land commission bonds of 1869—land commission bonds of 1870. These coupons, as we have seen, were negotiable securities, and hence the only question is whether there was any lawful authority for their issue. Not whether in issuing them the officers charged with that duty complied with all the conditions prescribed in the acts authorizing their issue, or, as it is phrased in the decision of the Court of Claims, whether they were issued "in accordance with law," but was there a law authorizing their issue? The bonds to which these coupons were originally attached bear upon their face the evidence that they were issued in pursuance of certain acts of the general assembly, referring in express terms to such acts. These bonds, together with their coupons, must, therefore, upon the foregoing principles, be regarded as valid debts in the hands of *bona fide* holders, if the acts so referred to be constitutional and do in fact authorize their issue, even though it may now appear that all the conditions prescribed may not have been complied with, and even though there may have been the grossest frauds perpetrated by the officers and agents of the state in issuing them and putting them into circulation.

It is not and cannot be denied that the acts so referred to do in fact purport to authorize the issue of the bonds, except in the case of the second issue of bonds for the payment of the interest upon the public debt, for which there does not seem to have been the shadow of authority of any kind, and which, therefore, are absolutely void, no matter in whose hands they may be. For, if the act be construed as giving authority for a *second* issue, there is no conceivable reason why a third or fourth or an indefinite number of issues could not have been made upon the same construction; and, certainly, a construction leading to such a result cannot be the correct one. It is a mistake to suppose that because the consolidation act authorizes the funding of $1,197,000 of

bonds issued under the act of August 26th, 1868, to pay interest upon the public debt, there was, therefore, an over-issue under that act of $197,000. The act does not limit the amount of bonds to be issued to $1,000,000, but simply limits the amount to be raised to that sum, and judging from the prices at which the bonds were then selling, the only matter of surprise is that a much larger amount of bonds had not been issued. If this be so, then the only remaining question is whether these various acts purporting to authorize the issue of bonds are constitutional. Various objections have been raised to their constitutionality, which we will proceed to consider.

The constitutionality of the act entitled "An act to authorize a loan to redeem the obligations known as the bills receivable of the State of South Carolina," ratified August 26th, 1868, (14 *Stat.* 17,) is assailed upon the following grounds :

1. Because the debt thereby purported to be contracted was not for the purpose of defraying "extraordinary expenditures," and is, therefore, a violation of Article IX., Section 7, of the constitution. This objection is manifestly based upon the idea that the word "extraordinary" is used in that section in its popular sense, whereas it is clear from the context that it is only used in contradistinction to the word "ordinary," as the latter word is used in the sense of current or usual annual expenditures in a preceding section of the same article; for in Section 3 of that article the constitution declares that "The general assembly shall provide an annual tax sufficient to defray the expenses of the state *for each year ;* and whenever it shall happen that *such ordinary* expenses of the state for any year shall exceed the income of the state for such year, the general assembly shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of the ensuing year." After thus providing for the expenses of the state government (of course meaning the government which was then to go into operation under the provisions of the constitution of 1868), designated as "ordinary," in the sense of current annual expenses, the constitution proceeds, in Section 7, to provide that "for the purpose of defraying extraordinary expenditures, the

state may contract public debts "—that is, for the purpose of defraying all such expenditures as do not fall within the class of ordinary current annual expenses, the state may contract debts. It is a matter of history that upon the reorganization of the state government of 1868, that government found itself not only with an empty treasury, but embarrassed with debts con-tracted by the government to which it had succeeded, some of which were floating in the shape of bills receivable and bills of the bank of the state, and some funded, upon which there was a large arrearage of past due interest. These debts were mani-festly no part of the *ordinary* current annual expenses of the state government then going into operation, which the constitu-tion required should be provided for by an annual tax, and to obtain the means of providing for such debts, as that govern-ment was undoubtedly bound to do, it was absolutely neces-sary that *extraordinary* expenditures should be incurred. This objection, therefore, does not appear to us to be well founded.

2. The next ground is that the act in question does not levy a tax annually sufficient to pay the annual interest of the debt, the contracting of which it purports to authorize, and is, therefore, in violation of one of the clauses of Article IX., Section 7, of the constitution. This objection is disposed of by the decision of this court in the case of *Morton, Bliss & Co.* v. *Comptroller-General,* 4 *S. C.* 430. Whether that decision be right or wrong, until overruled by competent authority it stands as an authorita-tive construction of those sections of the constitution which are therein considered, binding not only upon every citizen of the state, but upon every tribunal which undertakes to administer its laws. To say, as has been said, that each judge has a right to determine for himself the proper construction of a clause of the constitution, regardless of the construction which may have been placed upon it by superior authority, amounts to saying that we have no settled law, and that we are living in a state of anarchy. It is quite true that each judge, as well as each of the other officers of the state, takes an oath to observe the constitu-tion ; but the constitution is not what he construes it to be, but what it is construed to be by the tribunal invested with the power to determine what is the proper construction. As long as

human language remains imperfect, it is absolutely essential that in every well-regulated community, living under a written constitution, there should be some tribunal of last resort, invested with the power to decide authoritatively upon the true meaning of the terms used in such constitutions. Here the Supreme Court is such tribunal, and when it has determined the proper construction of any particular clause of the constitution, such construction becomes the supreme law of the land, binding alike upon every citizen, every officer and every department of the state government, until it is reversed or altered by proper authority—that is, by a subsequent decision of the same tribunal, or by the Supreme Court of the United States in any of those cases which fall within the jurisdiction of that court. But even were we now to overrule the decision in the case of *Morton, Bliss & Co.* v. *Comptroller-General,* that could not affect the result in the cases now before the court. That decision was rendered August 27th, 1873, and at the very next session of the general assembly the act was passed under which the bonds were issued which are now called in question. These parties, therefore, must be regarded as having acted upon the faith of the law as it was then authoritatively declared to be, and their rights cannot be affected by any subsequent change in the law, whether such change be effected by statute or judicial decision. Such, at least, is declared to be the law by the Supreme Court of the United States, which, as we have seen, claims and exercises the right finally to decide such questions as we are now considering.

The rule, as stated by Taney, C. J., in *Ohio Life Insurance and Trust Company* v. *Debolt,* 16 *How.* 432, is as follows: "The sound and true rule is that if the contract, when made, was valid by the laws of the state, as then expounded by all the departments of its government and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature or decision of its courts altering the construction of the law." This rule was recognized and affirmed in the same terms in *Gelpcke* v. *Dubuque,* 1 *Wall.* 206, and to it was added the following language: "The same principle applies where there is a change of judicial decision as to the constitutional power of the legislature to enact the law. To this rule,

thus enlarged, we adhere. It is the law of this court. It rests upon the plainest principles of justice. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal." This rule was again affirmed in the case of *Lee County* v. *Rogers*, 7 *Wall.* 181, and the question was there said to be not open for re-examination in the Supreme Court of the United States. It is perfectly manifest, therefore, that even were we now to overrule the case of *Morton, Bliss & Co.* v. *Comptroller-General*, it could not help the case of the state, in view of the rule thus firmly established, whether correctly or not we are not called upon to say, by the tribunal of last resort.

It is argued, however, that the decision in the case of *Morton Bliss & Co.* v. *Comptroller-General* is confined to the five bonds there considered, none of which are under consideration here. This, we think, is an entire misconception of the effect of that decision. What is said in that case in regard to confining the remedy there applied for to the particular bonds mentioned in the pleadings, manifestly was not intended to have, and could not have, the effect of confining the operation of the decision of the various constitutional questions there discussed to the five bonds there in issue. A court of justice, when called upon to administer a remedy under a statute which is alleged to be unconstitutional, must first determine whether the statute is liable to the objection urged against it, and, having determined that question, it then proceeds to inquire whether the parties in the case have shown themselves entitled to such remedy. The two inquiries are entirely distinct and separate. Whether the objection urged against the constitutionality of the act is well founded is one thing, and whether the parties in the particular case have shown themselves entitled to the remedy which the act purports to give rise to is quite another thing. The decision of the one question was an authoritative construction of a particular clause of the constitution, which necessarily affects every one, while the decision of the other question could only affect the parties then before the court. The decision of the various constitutional questions raised in the case must necessarily be conclusive whenever the same questions arise in any other case, though the ap-

plication of the remedy claimed as following from such decision must be confined to the particular parties who had shown themselves entitled to such remedy.

3. The next ground upon which this act is claimed to be unconstitutional is that bills receivable are bills of credit, and are, therefore, within the prohibition contained in Article I., Section 10, of the constitution of the United States, which declares that "no state shall   *   *   *   emit bills of credit." Whether bills receivable are bills of credit within the meaning of that clause of the constitution of the United States it is not important for us now to consider, inasmuch as such a question is, in our judgment, wholly immaterial to the inquiry in which we are engaged. It will be observed that the prohibition is against the *issue* of such bills—not against their payment. If, therefore, these bills are of the character claimed for them, it may be that they would be invalid and worthless as legal obligations in the hands of those who happened to hold them, and that if the question were whether the payment of such bills could be enforced, or whether the officers of the state should be restrained from issuing them, the position taken by the attorney-general would be entitled to great consideration. Such, however, is not the question. It is not, and cannot be, denied that these bills were issued by the proper officers of the state, under an act of the general assembly purporting to confer authority for so doing, and that the state received full value for them. When the state government was reorganized in 1868, they found these bills outstanding, and, even though it should be admitted that they were unconstitutional in form, they nevertheless represented valid and *bona fide* indebtedness of the state. If the state saw fit, voluntarily, to recognize such indebtedness, even though it stood in a form which affected its legal obligation, and provided for paying it or funding it in a form to which there could be no constitutional objection, we cannot conceive how such an act on the part of the state, in conformity, as it was, to the plainest dictates of common honesty, can be regarded as in violation of the constitution of the United States. So far from emitting or issuing paper supposed to be within the prohibition of that constitution, the state, on the contrary, made provision for the withdrawal of such

paper from circulation, and replacing it with other evidences of indebtedness in a form which would not be amenable to such constitutional objection.

4. The next ground of objection is, that the act in question was not passed by the requisite constitutional majority, by which is meant that the journal of the senate does not show a vote of two-thirds of *all* of the members in favor of the passage of the act, but only shows a vote of two-thirds of *those voting*—a quorum of that body. This objection is also disposed of by the decision in the case of *Morton, Bliss & Co.* v. *Comptroller-General*, and it is not necessary to repeat here what we have already said in regard to the effect of that decision. Inasmuch, however, as this seems to be one of the principal grounds of objection to that decision, we may add that it is not without the support of very high authority upon this point. See *County of Cass* v. *Johnston*, 95 *U. S.* 360.

The next act, the constitutionality of which is called in question, is "An act to authorize a state loan to pay interest on the public debt," ratified August 26th, 1868. 14 *Stat.* 18. This act is assailed upon the first and second grounds upon which the foregoing act was attacked, and it is not deemed necessary to add anything to what we have said above, except to say that while *current* interest upon the public debt may properly fall within the class of "*ordinary*" expenses, yet the interest provided for in this act not being the current interest, it cannot be placed in that class, and must, therefore, fall into the class of "*extraordinary* expenditures;*" for it will be remembered that while provision has been made by the act of September 21st, 1866, (13 *Stat.* 391), as supplemented by the act of December 20th, 1866, (13 *Stat.* 421), for funding the interest on the public debt up to July 1st, 1867, there would be no provision for the interest which accrued from July 1st, 1867, to November 1st, 1868, the beginning of the first fiscal year of the government as then reorganized, unless the act which we are now considering be regarded as intended to provide for such interest. It is a mistake to suppose that provision was made by taxation for such interest by the appropriation act of March 23d, 1869, (14 *Stat.* 237), for that act was expressly declared to be an act to make appropriations for the

year *commencing* in October, 1868, and hence no appropriation made by that act could be regarded as made for the payment of interest accrued *prior* to October, 1868. Then, too, the very language used in Section 7 of that act—" For the payment of the interest on the public debt, accrued since the same was *last* funded, five hundred thousand dollars "—shows that such appropriation was not designed to pay interest accrued prior to October, 1868. The interest was first funded—by the acts of 1866, above cited— up to July 1st, 1867 ; then the interest which accrued between July 1st, 1867, and November 1st, 1868, the commencement of the first fiscal year of the reorganized state government, was provided for by the act now under consideration, and must be regarded as the *last* funding of interest ; and the interest for the year *commencing* in October, 1868, is provided for by the appropriation,act of March 23d, 1869, above cited ; while, by the act of March 1st, 1870, (14 *Stat.* 382), an appropriation is made to pay the interest on the public debt for the year commencing November 1st, 1869 ; and so on, from year to year, as long as the general assembly saw fit to provide for the payment of interest on the public debt. Nor can any argument be drawn from the fact that the amount authorized to be raised by the act now under consideration largely exceeded the *estimate* presented by the comptroller-general at the beginning of the regular session of 1868–9, of the amount of interest due on the *first* of October, 1868, for that was only an *estimate*, and it might very well have been supposed that such estimate, made so soon after the reorganization of the state government by an officer who had had no previous acquaintance with the operations of the government which had been superseded, would not prove to be correct, and hence the act under consideration might very well give authority to the governor to borrow a sum not exceeding $1,000,000, especially when such authority was qualified by the words, " *or so much thereof as he may deem necessary.*" And it must be remembered that such estimate did not include the interest for the month of October, nor did it include any interest upon such additions to the public debt as had been authorized by acts passed at the preceding extra session.

The next act which we propose to consider is, " An act to close

the operations of the Bank of the State," ratified September 15th, 1868. 14 *Stat.* 21. The counsel for the state discuss this act as if the bonds issued under its authority created a *new* debt on the part of the state, and, therefore, contend that its constitutionality must be tested by the provisions of Section 7, Article IX., of the constitution, for they urge the same objections as were urged against the foregoing acts. But the act now in question does not purport to *create* any *new* debt. It does not even authorize the borrowing of money to pay an old debt. It simply authorizes the funding of certain obligations for which the state was liable, then outstanding, in the shape of bills of the bank, in the bonds authorized by the act. In other words, instead of authorizing the issue of bonds to raise money to pay outstanding debts, it simply authorizes the change of the form of such indebtedness from bank bills to bonds, and its constitutionality must be tested by the provisions of Section 10, rather than Section 7, of Article IX. of the constitution. Such objections cannot, therefore, be sustained. Another ground of objection, however, is that these bills were not "stock, bonds or other evidences of indebtedness of the state, issued by it," and the act is, for that reason, in violation of the provisions of Section 10, Article IX., of the constitution. It is quite true that these bank bills were not either stocks or bonds of the state, but we are at a loss to conceive how any one can deny, in view of the provisions of the bank charter, that such bills were "evidences of indebtedness," which, though not previously issued *directly* by the state, were issued by a corporation created by the state, in which it was the sole stockholder, under express authority from the state, for the sole benefit of the state. For the charter expressly provided that "the faith of the state is hereby pledged for the support of the said bank, and to supply any deficiency in the funds specially pledged, and to make good all losses arising from such deficiency." 8 *Stat.* 24. Of course, it must be remembered that the liability of the state for these bills was incurred under a constitution which did not impose the same limitations upon the power of the general assembly to contract debts as are contained in the constitution of 1868, and the state having, under the previous constitution, incurred a liability, evidenced by these bank bills,

issued by its authority, we see no reason why the present state government, under the present constitution, may not change the form of such liability by converting these "evidences of indebtness" in the shape of bank bills into bonds.

The next act to be considered is "An act to authorize a loan for the relief of the treasury," approved February 17th, 1869. 14 *Stat.* 182. This act we regard as liable to two constitutional objections: 1st. It purports to create a debt which was not "for the purpose of defraying extraordinary expenditures;" and, 2d. The debt therein sought to be created is not "for some *single* object," and such object is not "distinctly specified therein," and it is, therefore, in violation of two of the clauses of Section 7, Article IX., of the constitution. As we have already seen, provision had previously been made for the redemption of the bills receivable and for the payment of the interest on the public debt then in arrear, and we are not aware of any other expenditures which the general assembly were then called upon to provide for which could properly be classed amongst "extraordinary expenditures," and none such have been suggested to us. The most natural inference is that the object of this act was to raise money to meet the current demands upon the treasury, in anticipation of the collection of the taxes levied for that purpose, and such demands, as we have seen, fall into the class of ordinary expenses, and cannot, therefore, be regarded as "extraordinary expenditures." Again, the debt which this act purports to authorize cannot be said to be "for some *single* object," nor is such object "*distinctly* specified therein." Money borrowed "for the relief of the treasury" might and would be applied to as many different objects as there were demands upon the treasury. We think, therefore, that this act clearly violates both clauses of the constitution above referred to, and, upon the principles heretofore announced in this opinion, every bond, together with its coupons, issued under the authority of this act is absolutely void even in the hands of a *bona fide* holder because issued without any authority whatever, and hence every consolidation bond resting upon such bonds or coupons is, to the extent that it does rest upon such bonds or coupons, not a valid debt of the State of South Carolina.

The next act which we propose to consider is "An act to pro-vide for the appointment of a land commissioner and to define his powers and duties," approved March 27th, 1869, (14 *Stat.* 275,) and the act amendatory thereof, approved March 1st, 1870, (14 *Stat.* 385.) The constitutionality of these acts is assailed: 1. Upon the ground that they relate to more than one subject and such subjects are not expressed in their titles, and they are, therefore, in violation of Section 20, Article II., of the constitu-tion. This objection has already been disposed of by the decis-ion in the case of *Morton, Bliss & Co.* v. *Comptroller-General*, to which may be added the case of *San Antonio* v. *Mehaffy*, 96 *U. S.* 312, in which the Supreme Court of the United States put the same construction upon a similar clause in the constitution of the State of Texas. 2. Upon the ground that these acts were not passed by the requisite constitutional majority—that is, by the vote of two-thirds of *all* the members of each branch of the general assembly—but only by the vote of two-thirds of the members voting, being a quorum. This ground has been already considered and disposed of. 3. Another objection, however, is that it does not appear that the vote upon the passage of the first of these two acts now under consideration was entered upon the journal of the house of representatives as is required by Section 7, Article IX., of the constitution, which, in speaking of acts authorizing the contracting of public debts, provides that "no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the general assembly, *to be recorded, by yeas and nays, on the journals of each house respectively.*" This provision, it will be observed, is more stringent than that contained in Section 21, Article II., providing that "no bill shall have the force of law until it shall have been read three times, and on three several days, in each house." In the former, the constitution expressly requires, not only that such law shall be passed by a vote of two-thirds of the members, but also that such vote shall "*be recorded, by yeas and nays, on the journals of each house,*" while in the latter the requirement sim-ply is that the bill shall be read three times, and there is no requirement that the fact that it has been so read shall be recorded on the journal. Hence, while it would be entirely

T

legitimate to infer that an act which has the great seal of the state affixed to it has been signed by the presiding officers of the two houses, approved by the governor, or, in the absence of such approval, certified to by the secretary of state as having become a law by reason of the failure of the governor to return it within the time required by the constitution, deposited in the archives of the state and published among the laws, under the superintendence of the secretary of state, is a valid law, even though the journals may not affirmatively show that the act was read three times, as we have decided in the case of *City Council of Charleston* v. *Grand Lodge of A. F. M.*, and as has been decided by the Supreme Court of Illinois under a similar clause in the constitution of that state (*Supervisors of Schuyler County* v. *People,* 25 *Ill.* 181,) yet when the constitution expressly requires that the vote upon the passage of a bill shall be entered upon the journal, and the journal does not contain such entry, there is no room for inference, but there is positive proof of the omission of one of the constitutional requirements, and, in such a case, the bill would fail to become a law. *Town of South Ottawa* v. *Perkins,* 94 *U. S.* 260, in which the Illinois cases are collected, and from them it will appear that the Supreme Court of that state draws the same distinction that we have done. If, therefore, the objection which we are now considering be well founded in fact, it is well taken. It appears to us, however, from an inspection of the journal of the house of representatives, that there is no foundation in fact for the objection. It is quite true that on page 425 of house journal for the sessions of 1868–69, it does not appear that the vote on the third reading of the original bill was taken by yeas and nays, or that such vote was recorded by yeas and nays on the journal; but it is very obvious that this was not the vote upon the bill as it finally passed, for an inspection of the senate journal for the same session, pages 521–526, will show that the bill which came from the house was entirely remodeled, and the house journal, pages 630–632, shows that the bill, as thus remodeled, was finally passed by a two-thirds vote—yeas 50, nays 15—and that such vote was recorded by yeas and nays on the journal of the house. This we regard as a substantial compliance with the provisions of the constitution, more so, in

fact, than if the journal simply showed the passage of the bill as it originally went from the house by a two-thirds vote and did not show such a vote upon the final passage of the bill after it was amended in the senate, for the vote on the bill as it went from the house would not show the assent of the requisite two-thirds of that body to the provisions which eventually became the law, while the vote upon the bill after it was amended in the senate did show such assent, and this is the real object of that clause of the constitution. It seems to have been the practice of the house of representatives at the time these acts were passed, contrary to what had been previously the practice, to read bills originating in the house three times before they were sent to the senate, whereas under the former practice after a bill had received two readings in the house it was sent to the senate for its consideration, and, if amended in that body, such amendments could be considered when the bill came back to the house for its third reading. But under the other practice, where a bill has been so materially altered in the senate as the one now under consideration seems to have been, it would practically defeat the very object of the constitutional provision now under consideration to hold that a two-thirds vote on the bill, as it went from the house after its third reading there, would satisfy the requirements of such provision. For it might frequently happen, just as it did happen in reference to the very act we are discussing, that its features might be very materially changed in the senate and totally new provisions inserted, which might be passed by a bare majority of a quorum in the house, and the various provisions of the act would not in fact have what this provision of the constitution was intended to secure—the assent of two-thirds of both branches of the general assembly to all the various provisions of the act; so that when the journals show, as they do in reference to the act under consideration, that the bill, as amended, received the assent of the requisite two-thirds of both branches of the general assembly, we think the constitutional requirement was fully complied with.

As to the " Act to provide for the conversion of state securities," approved March 23d, 1869, (14 *Stat.* 241,) it not being an act to authorize the borrowing of money or the contracting of

any new debt, but simply providing for a change in the form of that then existing, the question of the validity of the bonds issued under it must be determined by an inquiry into the validity of the securities therein authorized to be converted. So that any bond issued under this act, which was not issued in exchange for some then-existing valid debt of the state, in the form of stocks or bonds, was issued "without any authority of law," and is, therefore, absolutely void, even in the hands of a *bona fide* holder.

The "Act to authorize the financial agent of the State of South Carolina to pledge state bonds as collateral security, and for other purposes," approved March 26th, 1869, (14 *Stat.* 258,) will next be considered. It is not pretended that the object of this act was to authorize the issue of any bonds or the contracting of any additional debt, for its sole purpose seems to have been to authorize the financial agent to dispose of the bonds, the issue of which had been previously or should be thereafter authorized, in a particular way. This act, therefore, did not come within the provisions of Article IX., Section 7, of the constitution, and the fact that it was not passed by a two-thirds vote cannot affect its validity. In Article IX., Section 14, the constitution prescribes that "Any debt contracted by the state shall be by loan on state bonds," but how such loans are to be effected is left to the discretion of the general assembly. Whether they shall be by a *sale* of the bonds, (the most questionable mode, if the words above quoted be given a rigid literal interpretation,) by direct borrowing, as in case of one individual borrowing from his neighbor a thousand dollars, and giving his bond directly to the lender for the amount, (a mode so inconvenient in case of a state as to be almost impracticable,) or by a deposit of the bonds as collateral security for such sums as may from time to time be advanced to the state, as its necessities require, are all matters which are left for the general assembly to determine. We do not see, therefore, how the act now under consideration can be regarded as in conflict with any provision of the constitution.

The last objection which is urged against all the bonds issued under the several acts which we have been considering is, that they were not registered in conformity to the provisions of Sec-

tion 14 of Article IX. of the constitution. The language of that section is as follows : "Any debt created by the state shall be by loan on state bonds of amounts not less than fifty dollars each, on interest, payable within twenty years after the final passage of the law authorizing such debt. A correct registry of all such bonds shall be kept by the treasurer, in numerical order, so as always to exhibit the number and amount unpaid, and to whom severally payable." It is very manifest that this provision in regard to the registry of the bonds is a mere direction to the treasurer, and was not designed to be a condition precedent, the performance of which should be necessary to the validity of the bonds. It does not provide that before any bond is issued it shall be registered by the treasurer, but it is clear that the registration is to follow, not precede, the issue of the bonds, and could not, therefore, affect their validity. No other construction is consistent with the language used, for it will be observed that the treasurer is not only required to keep such registry, but he is to keep it "so as always to exhibit the number and amount unpaid." Now, as the mode of keeping the registry must be regarded as quite as imperative as the direction to keep it, it must be manifest that it never was designed that this provision of the constitution should be regarded as essential to the validity of the bonds, for in order to keep such registry "so as always to exhibit the number and amount unpaid," it would, of course, be necessary for the treasurer to make alterations in the registry, from time to time, as one or more of the bonds were paid ; and surely it would not be pretended that the failure of that officer to keep the registry in such mode, by making such alterations as from time to time became necessary, would invalidate bonds which otherwise would have been good. The constitution was never designed to afford the means of setting a trap for the holders of the bonds of the state by making their rights dependent upon the performance or non-performance of duty by one of the officers of the state after the bonds had been issued.

Our conclusions, therefore, are :

1. That all the bonds issued under an act entitled "An act to reduce the volume of the public debt and provide for the payment of the same," are valid obligations of the State of South

Carolina, except as follows: 1st. Such as were issued in exchange for bonds issued under the act entitled "An act to authorize a loan for the relief of the treasury," or for the coupons of such bonds. 2d. Such as were issued in exchange for the second issue of bonds under an act entitled "An act to authorize a state loan to pay interest on the public debt," or the coupons of such bonds. 3d. Such as were issued in exchange for those conversion bonds which were issued in exchange for either of the two classes of bonds last mentioned, viz., bonds for relief of the treasury and the second issue of bonds to pay interest on the public debt, or in exchange for the coupons of *such* conversion bonds.

2. If any consolidation bond rests wholly upon any of the three objectionable classes of bonds or coupons just mentioned, then it is wholly void; but if it rests only in part upon such objectionable bonds and coupons, then it is only void to the extent which it does rest upon such objectionable bonds or coupons, and for the balance it is a valid obligation of the state.

3. That the burden of proof is upon the state to show that any particular bond which may be brought into question does rest either in whole or in part upon such objectionable bonds or coupons, and if in part only, then the state must show what part is so affected.

The judgment of the Court of Claims is set aside, and the cases are remanded to that court for such further proceedings as may be necessary under the principles herein announced.

WILLARD, C. J. It will be unnecessary to add anything to what has been already said, in the opinion of the court, as to those matters in respect to which there is entire unanimity in the court. I shall confine myself to noticing the leading points, as to which some difference of opinion has arisen in the court.

The first question that will be considered is, whether constitutional authority existed for the issuing of the class of bonds that have been termed the second issue of bonds to pay interest on the public debt. The history of the transaction in question is briefly as follows: An act was passed August 26th, 1868, entitled "An act to authorize a state loan to pay interest on the public debt,"

authorizing the governor " to borrow, on the credit of the State of South Carolina, on coupon bonds, within twelve months after the passage of this act, a sum not exceeding $1,000,000, or as much thereof as he may deem necessary to pay interest on the public debt." It appears in evidence that bonds to the nominal amount of $1,000,000 were issued and sold under the authority of this act. It also appears that after such bonds had been so issued, and, as we must assume from the evidence, had become the property of private individuals, it was urged upon the financial board, which consisted of the governor, the attorney-general and the state treasurer, that the bonds would be more salable if in a form that would not make it appear that they were intended for the payment of interest on the public debt. The financial board thereupon assumed authority to retire the outstanding issue by replacing it with bonds prepared under the same act, and bearing the same date as the bonds which had already been issued thereunder, but omitting from their face the objectionable statement that was supposed to prejudice their marketable quality. It appears also that bonds so issued for the sole purpose of replacing such previous issue were sold for original bonds, and were not, in fact, used for the purpose of replacing previous issues. The question is, whether sufficient authority existed in the financial board to create bonds of the class just named that in the hands of a *bona fide* holder for value, would constitute a valid obligation of the state.

The first question is one of fact, namely, what was the nature of the authority that the financial board thus attempted to exercise? This must be disposed of upon the evidence in the case. It is very clear that what the financial board assumed to do, and *all* it assumed to do, was to change in point of form, as to an immaterial matter, so far as it affected the liability of the state, outstanding obligations of the state. It is not pretended that the board intended to create one dollar of new debt. There is not the slightest evidence that the governor, who was a member of the board, intended or had in contemplation as a consequence of the transaction to add to the sum that had already been borrowed under the act already mentioned, a single dollar to be applied according to the purposes of that act, namely, " to pay interest

on the public debt." The sole object of the transaction, as we are bound from the evidence before us to conclude, was to make an immaterial change in the form of securities evidencing outstanding obligations of the state.

It is not competent to argue that because the action of the board appears to have resulted in the creation of new debt, that that circumstance stamps the nature of the authority attempted to be exercised. In the first place, we are bound from the evidence to assume that there was a distinct abuse of the authority attempted to be vested in him, on the part of the financial agent, who, instead of issuing the new bonds for the exclusive purpose of retiring the first issue, as to part of them at least, used them for the purpose of creating a new debt. We have no right as matter of legal conclusion, in the absence of evidence supporting such a conclusion, to hold that the board intended the wrong accomplished by the abuse of its authority. But even if it had been made to appear that the board intended that the retirement of the old issue should be accomplished by the sale of the new issue in open market, and the application of the proceeds of the sale to retiring the old bonds, that would leave the nature of the authority attempted to be exercised by the board entirely unchanged. It would still be, in its nature and essence, an attempt to change, as to matter of form, only an old obligation. It may be argued that such a method of effecting the change would not be a fair exercise of the power of conversion; that is quite a different question, that need not be passed on here. A power does not change its nature merely because it is abusively exercised. We are here drawing a distinction between two very different classes of powers, both of which are recognized by the constitution, but differ from each other most materially, both as it regards the sanctions necessary to give validity to the exercise of such powers, the mode of their exercise, and the effect of their exercise, both upon the state and third parties dealing with the state. It is of the greatest importance that this distinction should be clearly discerned and held in mind. To possess and exercise authority to bind the state by the terms of an obligation newly created, implies a delegation of authority of a very high order, and generally esteemed of so much importance and delicacy as to

receive the special attention of the framers of the fundamental law, and to be guarded with very careful constitutional restrictions, while to effect a change in the form by which an obligation is evidenced that does not touch its nature or extent, is, when authorized, a mere act of administrative detail.

Let us trace these distinctions into the constitution. Section 7, Article IX., provides as follows: "For the purpose of defraying extraordinary expenditures the state may contract public debts, but such debts shall be authorized by law for some single object, to be distinctly specified therein, and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the general assembly, to be recorded by yeas and nays in the journal of each house, respectively, and every such law shall levy a tax annually sufficient to pay the annual interest of such debt."

Here is a distinct negation to the state of power under the constitution to create public debts, except where that power is exercised for particular purposes and in a particular way, and it is of course a negation of the authority of any agent of the state to create such debts in a manner inconsistent with the provisions of the constitution.

Section 10 of Article IX. deals with the powers of evidencing existing obligations, including that of changing the forms of such evidence. It provides that no scrip, certificate or other evidence of real indebtedness shall be issued except for the redemption of stocks, bonds or other evidences of debt previously issued, or for such debts as are expressly authorized in the constitution.

In these provisions we have distinctly recognized the two classes of powers—the one capable by rightful exercise of bringing into existence a new specific obligation of the state, and the other of certifying in form a debt already existing. It is perfectly clear that the authority which the board attempted to exercise in the present case is that regulated by Section 10, and not that treated of in Section 7.

Our attention has not been called to any act authorizing the financial board, or the officers composing that board, individually, to issue any bond, certificate or evidence of debt by way of changing the evidence of any antecedent debt of the state. After

a careful examination of the acts I am unable to find any evidence that the governor, attorney-general and the treasurer possessed legal authority to exercise any such power, or even to act as a board under the name of the "financial board." The only authority conferred upon them, so far as I am able to find, is contained in certain sections of acts authorizing the borrowing of money for particular objects. These powers relate exclusively to the particular cases in reference to which they were given. 14 *Stat.* 17, 18, 182. The only power conferred as it regards the loan for paying interest on the public debt is contained in the fifth section of that act, and is as follows, (14 *Stat.* 18): "That the bonds authorized by this act shall be sold at the highest market price, and for not less than a sum to be fixed by the governor, attorney-general and the treasurer, who are hereby authorized to appoint, under a commission signed by them, some responsible bank or banker in the city of New York, to be subject to their direction and control, and they are further authorized to pay such sums of money as may be necessary to effect the purposes of this act out of any funds of the state not otherwise appropriated." This power is not in the least analogous to that attempted to be exercised and cannot include it.

The only power at all analogous to that in question was conferred in the particular case of the issue of bonds to redeem the bills receivable of the state and was confined to that object. That act (14 *Stat.* 17, § 5,) provides "that the bonds authorized by this act shall be sold at the highest market price by the financial agent of the state in the city of New York, and not less than for a sum to be fixed by the governor, attorney-general and treasurer, who shall fix the time of redemption and redeem said bills receivable at the office of the state treasurer, and they are further authorized to pay such sums of money as may be necessary to effect the purposes of this act out of any funds of the state not otherwise appropriated." The powers here conferred on the persons who claimed to constitute the board are confined to the retirement of the bills receivable, and, being thus specially delegated, instead of supporting, contradicts the assumption that they had general powers of that nature, while the fact that no such power was conferred as it regards the class of bonds in

question shows that it was not intended to be granted to be exercised in any form. Such powers as are claimed here nowhere appear granted either expressly or as incidents to other powers granted.

It will not be seriously contended that the governor, attorney-general and treasurer could, either singly or unitedly, assume to change the form of an outstanding obligation of the state, in any respect, without the authority of the legislature therefor. It is apparent that the legislature, whose authority they claimed to exercise, took the same view of this question as that just expressed, for that body passed an act entitled "An act to provide for the conversion of state securities," March 23d, 1869, (14 *Stat.* 241,) which covered the exercise of the very power in question, namely, that of changing the form of existing obligations. This act allows bonds to be changed into stock and stock into bonds, but does not authorize any other change to be made in any evidence of indebtedness, and altogether ignores the existence of any authority of that description in the hands of the financial board or the officers composing it, though two of them, the governor and the treasurer, have duties to perform under this act.

It must be concluded that the governor, the attorney-general and the treasurer had no such authority, collectively or individually, as would enable them or either of them to put out an obligation for the redemption of an antecedent debt or obligation of this state, or in any way to change the form in which any such debt may be evidenced.

It is necessary to notice a view that has been strenuously urged, namely, that the action of the financial board must be referred to authority contained in the act under which the bonds in question purport to be issued, communicated to the governor, to issue as many bonds as he should at any time judge necessary, for the purpose of borrowing money sufficient to pay the interest on the public debt, provided he did not overstep the limit of the amount to be borrowed, namely, $1,000,000. This proposition has already been answered in part. It is clear that if the governor had such authority he has not attempted to exercise it. It assumes that the governor found that the proceeds of $1,000,000 of bonds was not sufficient to pay the outstanding interest on the

public debt. There is not a particle of evidence that the governor ever arrived at any such conclusion or attempted to act upon it; on the contrary, the evidence shows that the governor was satisfied with the amount issued, and did not intend to give any authority to increase the sum to be borrowed beyond what was intended by the first issue. He attempted to change, in certain respects, the form of the security taken, but did not purpose to borrow more money. This completely disposes of the argument. But, it is apparent, the governor had no such authority.

It is not necessary to contend that after the governor had once made up his mind that a certain sum was necessary he could not afterwards increase that sum; but the proposition that disposes of the question is, that after he had fixed the whole amount to be raised and had actually issued it, the whole intention of the act was carried out, and the authority it conferred spent. All the ·act contemplated was that the governor should exercise a certain authority, based on his own judgment, of the extent to which that authority should go within a certain general limit. After he had exercised his discretion, and had performed the act intended to be based upon it, what remained to accomplish the full purpose of the act? Possibly if an act conferring authority on a public officer, intended to meet the case of making provision against future contingencies, should be brought in question, its purposes, when rightly understood, might give rise to the conclusion that it was intended as a continuing power. But here the matter to be ascertained by the governor was such as a sum in arithmetic would solve, and no ground is afforded by enlarging the sense of the words used by holding that it was intended that the governor should have a continuing open judgment in the matter.

It is said that the amount that the bonds would bring on public sale was uncertain, and, therefore, the governor could not know until the sale was over how much money would be derived from the proceeds for the payment of interest. But the governor knew how much money had been realized when the further sale was stopped. The completion and termination of the issue, in view of the fact that in his judgment enough money had been raised for the purpose, was an exhaustive exercise of his power

under the act. Had the issue been based on the actual amount needed, it would have been otherwise; but being based on the judgment of the governor as to what was needed, his final conclusion and action under it was a complete satisfaction of the purpose of the statute. The act contains no expression to signify that the act of borrowing or of issuing the bonds should be a continuous act, such as the phrase "from time to time," but authorizes what is described as a single act to be performed.

It is clear that parties having no legislative authority so to do have put in circulation evidences of indebtedness on the part of the state, and the holders of these evidences claim that they cannot be questioned as to their legal validity. A clearer case of the abuse of public authority cannot be stated, nor one that defies more openly all the safeguards placed by the constitution around the creation of public debts.

The next question to be considered is as to the validity of the bonds issued under the act entitled "An act to authorize a loan for the relief of the treasury," passed February 17th, 1869, (14 *Stat.* 182.) It is objected to these bonds that the object of borrowing is not sanctioned by the provisions of the constitution on that subject. Article IX., Section 7, is the one that alone afforded authority for the passage of the act. That section provides as follows: "For the purpose of defraying extraordinary expenditures, the state may contract public debts; but such debts shall be authorized by law for some single object, to be distinctly specified therein." The remaining provisions relate to the requirements for the purpose of giving validity to such an act, and are not in question here.

In the first place, this section must be regarded as a limitation of the power of the legislature to authorize the creation of debt by borrowing, of such a nature as to render any attempt to communicate authority for that purpose inconsistent with its provisions, abortive and inefficacious. Unless this section is powerless, this is its intended function. The use of prohibitory language is not indispensable in a provision of law in order to have that effect. When power is granted for the purpose of bringing into existence specific rights, the mode in which that power is required to be exercised is material to the creation of such rights, and the

provisions are mandatory. *State, ex rel. Attorney-General,* v. *City of Columbia.\** This principle depends on the nature of the powers granted, and is equally applicable to the construction of statutory and constitutional provisions. It follows that the legislature could only validly authorize the creation of public debt when the object was "defraying extraordinary expenditures."

What are, then, to be regarded as *extraordinary expenditures ?* If the verbal force of the expressions employed by the constitution was entitled to be solely considered, we should have to conclude from the third section of Article IX. that "extraordinary expenditures" were such as did not, in their nature, constitute the ordinary and current annual expenses of the state. It may be conceded that this view is included in the true construction of the language employed; but before *all* that may be embraced in the term "extraordinary expenditures" can be ascertained, a larger and vital principle of construction must be employed— one that is universally recognized among the canons of constitutional construction.

The necessities of a state may render the power of borrowing money indispensable even as to current expenditures, although, as an ordinary rule, the current expenses should be regulated from current income. War, domestic insurrection, pestilence and famine may be instanced as capable of giving rise to such an exigency as would warrant a departure from the safe, general rule of meeting current expenditures with current income. A constitution of government that cannot adjust itself to calamitous circumstances is of no practical value—as worthless as a man that cannot meet disease, or a ship that cannot endure a storm. No principle of construction that has the tendency to divest a constitution of government of the elacticity demanded for the reasonably-anticipated exigencies in human affairs, has the support of either principle or recognized authority. It must, therefore, be concluded that it is not impossible that what would generally be regarded as a current and ordinary expenditure may assume the character of an extraordinary expenditure under the

---

\* See *post* case No. 762.

influence of circumstances affecting the ability of the state to maintain itself.

Giving, then, to the act in question the benefit of this large and liberal construction, the question arises whether the act to authorize a loan for the relief of the treasury can be regarded as passed with a view to meet extraordinary expenditures.

The contents of the act do not assist in making its object any clearer than it is made by the statement in the title of the act. We must, then, inquire whether funds in relief of the treasury can be regarded as funds devoted to extraordinary expenditures. Clearly they cannot. The act would have undergone no material change in principle had its title been " to provide the means of meeting all demands upon the treasury." Such a title would include ordinary as well as extraordinary expenditures. As ordinary expenses are sure to arise, and extraordinary ones of merely contingent occurrence, such a title would have to be regarded as an indication of an intent to provide means to pay current and ordinary expenses. Such an act would be inconsistent with the constitution, and necessarily void. Thus, if we read the act as it stands, without the light of concurrent events, the inference to be drawn would be against its validity.

It may be a question whether, in view of the provisions of the constitution, a case for determining the actual intent of the legislature could be made out from the knowledge of circumstances that attended the passage of the act; but it is not necessary to consider this question, for the case affords no circumstances which, if admissible, would tend to correct the inference drawn from the language of the title and the body of the act. It is true the state was emerging from a great and exhaustive war, and was seeking to adjust itself to a new and untried constitution of government, was putting in operation new machinery for collecting and applying income, and was with an empty treasury and burdened with debt, but the legislation contemporaneous with the act in question precludes the inference that any exigency existed that would justify the borrowing of money in aid of the current demands upon the treasury.

An elaborate and carefully prepared act, regulating the assessment and collection of taxes, was passed September 15th, 1868.

Under this act it became the duty of all persons liable to the payment of taxes to make returns on or before October 20th then next ensuing. Each county auditor was required by Section 66 on or before the third Monday of December, 1868, and on the same day of each year thereafter, to transmit to the state auditor a transcript of the real estate of each township in his county. The taxes levied were to be payable on the first day of March thereafter. *Sec.* 79. The conclusion must be drawn from this act that all the machinery requisite to the assessment and collection of taxes was in existence at the time the act was passed to borrow money for the relief of the treasury, and nothing necessarily prevented the passage of the necessary supply and appropriation bills at or before that date. A supply and appropriation act was passed March 23d, 1869, a few days over a month after the passage of the act to borrow money for the relief of the treasury. The authority for the disbursement from the treasury of all moneys applicable to the payment of current expenses, is contained in the appropriation act just referred to, and by the inspection of the provisions of that act it appears that the matters included were of the class of ordinary expenses of the government. As we have seen, the proceeds derived under the act for the relief of the treasury were applicable to the payment of the appropriations made by this act, and thus we have clear ground for concluding that the object of the act for the relief of the treasury was to provide the means of paying the current and ordinary expenses of the government for the year 1869, and any deficiency that may have occurred for the fiscal year, or part of the year, of 1868.

The constitution (Article IX., Section 3,) requires "that the general assembly should provide for an annual tax sufficient to defray the estimated expenses of the state for each year, and whenever it shall happen that such ordinary expenses of the state for any year shall exceed the income of the state for such year, the general assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of the ensuing year." Here is a source made compulsory for meeting any deficiencies that might have stood from the

fiscal year 1868, as well as the current expenses of 1869. As such an act appears in the statute book, it must be assumed to be sufficient for the purposes contemplated by the constitution. If it be conceded that, if the passage of such act or its enforcement had been rendered impossible, that money might have been borrowed on the idea that expenses usually to be regarded as " ordinary " had become " extraordinary " under the operation of uncontrollable circumstances, still that would not help the validation of the act in question, for it appears by contemporaneous legislation that no such fact existed.

The question, then, resolves itself to this : Could the general assembly, in any year, create a public debt by borrowing for the purpose of anticipating the taxes or other current revenues of that year ? To that question only one answer can be given, and that is that such a case is outside of the power to borrow money, and therefore within its implied inhibition.

It will not be necessary to examine the other objections made to this act, as the view considered is regarded as fatal to the validity of the bonds issued under it.

The next question to be considered is, whether the act entitled " An act to reduce the volume of the public debt, and to provide for the payment of the same," passed December 22d, 1873, (15 Stat. 518), and ordinarily known as the consolidation act, is a legislative contract, binding the state and all parties coming in under it, so as to preclude an inquiry into the validity of the securities issued under its provisions. This question resolves itself into two inquiries. First. Whether it was competent for the legislature, by any act, to impart validity to obligations that were rendered invalid under the constitution. Second. Whether the act in question purports to have any such effect. The first of these questions has been fully considered in the leading opinion in this case and needs no further elucidation. The question involving the character and intent of the act will be noticed.

The first section of the act authorizes the treasurer to receive from the holders of bonds of certain specified classes such bonds, and also certain certificates of stock, and directs that he " shall thereupon, in exchange for and in lieu of such bonds and stocks so surrendered, issue to such holders other coupon bonds and

U

certificates of stock, as they may desire, equal in amount to fifty per centum of the face value of the bonds or certificates of stock so surrendered." A similar provision is made in Section 2 as it regards coupons from such bonds. Section 3 is as follows: "That the bonds and certificates of stock herein authorized to be issued shall bear upon their face the words 'consolidation bonds,' 'certificates of stocks,' and shall also bear upon their face the declaration that the payment of the interest and redemption of the principal is secured by the levy of an annual tax of two (2) mills upon the dollar upon the entire taxable property of the state, which declaration shall be considered a contract entered into between the state and every holder of said bonds and stocks," &c. It must be conceded at once that wherever the holder of one of the valid obligations of the state surrendered the same, and took in lieu thereof the bonds or certificates of stock provided to be issued under this act, at fifty per cent. upon the face value of the obligation surrendered, this clause became a binding legislative contract, based on an adequate consideration, namely, the surrender and relinquishment of one-half of the amount of such valid security, and, as such, the legislature has no power to dispense with it.

But the proposition here to be considered has regard to the surrender of obligations alleged to be unconstitutional and void. This act must be regarded as assuming the validity of all the bonds of the classes enumerated in it as the basis of the issue of new bonds, but not necessarily as declaring such validity. Had such a declaration been made, and not been left to implication, could it conclusively determine the existence of the fact declared? If so, then it would follow that the act must be considered a conclusive legislative contract as it regards all bonds or certificates of stock issued in exchange for the securities named in the first section, at the rate of reduction therein named. The bearing of this proposition is this: a legislative contract, like any other contract, must be upon consideration; and if the existence of that consideration is validly declared by law, the obligation resting on it must stand.

At this point the proposition is advanced that the legislature cannot make a declaration that would have the effect to preclude

inquiry into the constitutional character of its enactments. The application of the limitations of the constitution to the legislation passed under it is made by the courts, and if the nature of the limitation is such that it can only be tested by the existence of facts outside of the recitals of the acts themselves, the courts are bound to look to the existence of such facts as the ground of applying such constitutional limitations. To say, then, that the legislature may, in such a case, by a declaration, preclude the courts from examining the actual state of the facts, is to affirm that this authority and duty of the courts is not absolute under the constitution, but dependent on the will of the legislature—a proposition manifestly false. The consequence is, that neither an express or implied declaration that an obligation otherwise void is valid, can preclude inquiry into the validity of such obligation where it is alleged as a valid consideration for a legislative promise based upon it.

It is, therefore, necessary to inquire whether there was, in fact, any consideration in the case of a party giving up an invalid bond and taking another of less amount. The proposition answers itself. If the obligation was void nothing was given up, and therefore no consideration exists. As the legislature could not validly declare that to be lawful which the constitution pronounced unlawful, and as the act does not declare the validity of all the bonds, for which provision is made in *express terms*, whatever declaration is read in the act on that subject must be the result of implication, and as the rules of implication are based on the primary idea that that sense which is agreeable to law must be preferred, the most that can be concluded from the act is that it assumed the validity of the unenumerated bonds provided for. This assumption being disputable under the constitution, it placed the holder of the bond in the position of taking the chances of the correctness of the assumption in his favor, but gave him no higher assurance nor ground of certainty. When it is asserted that this legislative assumption gave the holder of a bond a presumptively good title, all the efficacy has been allowed to the statute as affecting him that can be allowed consistently with the constitution, or that construction of the intent of the statute which results from viewing it in the light in

which the constitution has placed it. That presumption is repelled the moment it appears by sufficient evidence that the obligation was, in fact, unconstitutional and void. This principle of construction was applied in *Neely* v. *McFadden*, 2 *S. C.* 169.

An attempt is made to meet the force of this argument by treating the consolidation act as a composition between a debtor and his creditors. It is claimed that the creditors of the state are to be regarded as parties to each transaction with any bondholder of the class provided for. In this way an attempt is made to make out a consideration in favor of A, arising from the fact that B took a less amount than was due to him. The answer to this is that the act exhibits no such character, either in form or substance. As it regards the force of the provisions made, they are, professedly, with each individual holder of a bond, coupon or certificate of stock alone. The test of this is the fact that had but a single person accepted the benefits of the act and complied with its provisions, there is no clause or condition that could have interfered with its entire efficacy as affecting him. It was not made a necessary feature of the scheme that all or any particular part of the persons for whose benefit it was intended should come in under it. Such being the case, it was competent, so far as the form of the transaction is concerned, that it should operate wholly with particular individuals, and should not depend for its validity on its acceptance by any number or class of individuals. If, then, it can, consistently with the language and terms employed, have such operation and effect, it ought to receive that construction, if it be found equally consistent with the spirit and fundamental intention of the act. This brings us to consider what was the true character of the transaction in its substance.

Conceding that if it be found that the act could not operate efficiently according to its intention, except by construing it as intending a compact among all who came in under it of such a nature that its considerations and obligations are mutual, as among all such parties—that in that case it might assume the character contended for—what is there to lead to any such conclusion? And here we may affirm that that is an unnecessary

construction, not called for by the necessities of the case, having only one argument, and that an unsound one, in its favor, namely, that it enables the parties to effect a successful evasion of the constitution and defeat its provisions. In itself, that argument should be ground for avoiding the conclusion to which it points. There is no other argument that has been, and it may confidently be asserted that none can be, adduced to support the view thus contended for. If, for instance, the act had been so framed that it could not take effect until all of a certain class or number came in, this then would be ground to contend that inducements would be offered by those anxious to come in to those opposed to or indifferent to that course to bring about that result, and in that case mutual consideration as among those thus coming in might be supposed. That, however, is not the case. Then, again, if the state had set apart a certain fund or sum of money to be divided up among all who should come in, the distribution of that fund to be at the disposal of the parties coming in, then mutual obligations and considerations among the parties coming by mutual consent upon such fund would be naturally and reasonably assumed; but the transaction did not have that character. The fact that the state offered to pay a sum less than the amount due on such debt does not alter the case, for such a tender could as well be made to A, B and C individually as collectively. It cannot be shown that anything was given up by a creditor that was intended to enure to the benefit of any other; on the contrary, all were treated alike, the same rate of reduction being applied to all, whether their demands were large or small. There is a total failure in the case to show any reason drawn from the nature of the transaction, and the terms and intention of the act to change that simple character that stands out on the face of the act into the more complex and cumbersome one contended for. This conclusion rests upon the simple proposition that one who parted with a good obligation gave a valid consideration to support the legislative contract imported by the terms of the act, while one who gave up a void and worthless bond gave no such consideration. The opposite construction rests upon the inadmissible proposition that A in giving up a worth-

less bond was in a worse position by reason of the fact that B had given up a good bond for less than its value.

It is clear, therefore, that there is no legislative contract founded on consideration to support the validity of any bond issued under the consolidation act, when the security for which it was issued was invalid in law.

There is no necessity for considering the limits of the authority of the legislature to ascertain or liquidate an uncertain or doubtful debt, as no such power was exercised in the consolidation act. The act sets out with no declarations that depend for their force on the assent of the parties coming in under it, and it affords no ground for an assumption that anything the act dealt with was regarded as unliquidated or disputable. It is very clear that whatever power the legislature possesses of the class just mentioned, its rightful exercise does not extend to a declaration that that is valid which the constitution declares to be otherwise.

The conclusions to which the court has arrived are not in conflict with anything decided in *Martin* v. *Comptroller-General*, 4 *S. C.* 430. The questions just considered were not raised or considered in that case.

HASKELL, A. J., dissenting.   Concurring in the result, so far as it affects other classes of vouchers, I dissent from the reasoning and the conclusion by which the "second issue of bonds to pay interest on the public debt," (August 26th, 1868,) and "bonds for the relief of the treasury," (February 17th, 1869,) are excluded from the operation of the consolidation act.

Some reasons for such dissent will be briefly stated.

The act of August 26th, 1868, 14 *Stat.* 18, clothed the governor with power to borrow money for the state by issuing bonds, and prescribed two limitations. *First*, relating to amount; *Second*, to time. It is not pretended that either of these restrictions was violated; but it is contended that the governor was, by the act, *impliedly* restrained from making more than a *single issue*. The act is, itself, very brief, and it is difficult, within the widest scope of its language, to find support for such a proposition.

But however interesting might be questions as to exhaustion

of power by a single exercise of it, or as to the right of the general assembly, without a two-thirds vote, to extend the time for the exercise of a power conferred in an act creating a public debt, or what disaster might result if the legislative body should authorize the executive to make successive issues of bonds at his discretion, to borrow money to a limited extent—however interesting in themselves—such questions do not properly arise in this case. For, so far as rights arising under the operation of the consolidation act are concerned, such objections are disposed of by the act itself, enacted as it was under the full light of the judicial determinations announced in the case of *Morton, Bliss & Co.*, 4 *S. C.* 430. The ruling of the court on the point referred to, is thus succinctly stated in the heading to the case as reported : " Where an act to create a public debt, by a loan on bonds of the state, is passed in the mode prescribed by the constitution of the state, but some requirement of the act—as, for instance, that the bonds shall be sold at the highest market price—is not complied with by the officer charged with its execution, it is competent for the legislature by an act, *not passed* by the vote of two-thirds of the members of each house, to waive the objection and validate the bonds."

The consequence is plain, for the officer is the mere agent of the general assembly, and the principal may waive objections to the irregularities of his agent, and, by recognition or other conduct, as well as by direct ratification, may validate his transactions. The Supreme Court having decided that a two-thirds vote was not necessary, the act of March 20th, 1869, to extend the time to make the issue, is of force. The consolidation act likewise, although not passed by the two-thirds vote, is of full force and effect so far as it has any relation to irregularities on the part of the agents employed by the legislature to issue the bonds therein named. Anterior to the passage of this act the " first " and " second issue " had been completed—the second in part canceling the first, and leaving outstanding from both issues $1,197,000 in bonds. The general assembly recognizes the amount and specifies it, and orders it to be treated as an existing debt of the state, under and by virtue of the act creating the debt, and, waiving any and all objections for irregularities or

lack of authority on the part of its agent, ratifies and confirms his acts. This point involves no constitutional question, for that, whether rightfully or not, was settled when the act was passed, but depends solely upon the law of recognition by the principal of the acts of his agent, and the ratification of them by such recognition. The recognition exceeds mere acquiescence in this case, and amounts to active confirmation, for the legislature rests a new contract upon the bonds thus recognized.

The objection to the other class of bonds "for the relief of the treasury" rests upon constitutional grounds, and as to them the recognition by the general assembly does not, for the same reasons above stated, remove the defect, if such there be.

The first ground is that the loan was not "to defray extraordinary expenditures. *Const.*, *Art. IX.*, § 7.

Money to be expended for the "relief of the treasury" certainly does not come within the "ordinary" expenses as defined by the constitution. That instrument carefully defines the "ordinary," and leaves to the word "extraordinary" every expenditure which does not come within the limits of the former. That is the sole question for the judiciary to consider; for if the expenditure be "extraordinary" in its nature, the general assembly, by the vote required by the constitution, has the power to create a debt by bonds to defray it. And it cannot for a moment be claimed that money for the relief of the treasury comes among "ordinary" expenses, which are otherwise directly provided for by the constitution.

It is quite immaterial that the court is not able to perceive what relief the treasury might require or the reasonableness of the expenditure. Those are matters left to the discretion of the general assembly. *Luther* v. *Borden*, 7 *How.* 45. But if that were a question within the jurisdiction, some light might be thrown upon it by the ordinance adopted January 29th, 1868, to levy a special tax and for other purposes, among which are drafts upon the treasury, with directions to the general assembly to raise funds, if necessary, to *reimburse* the treasury.

The other objection is that the debt is not for some single object distinctly specified. In obedience to another provision in the constitution, the "subject," or "object," (for the words are

synonyms in the sense in which they are there employed,) is distinctly stated in the title to the act, which is confined to the "subject" expressed in the title. *Art. II.*, § 20. The act to borrow money to pay the interest on the public debt is subject to the same objection, for its object is contained in the title, but, according to the decision in this case, comprehends, *by implica-. tion,* (1) the interest accruing at a particular time, and (2) interest on a great variety of classes of public indebtedness. I wish no more than the application of the same rule.

The annual tax act seldom specifies more than the general purposes, but leaves the details to the appropriation act; yet the validity of such an act could not for a moment be questioned. The general assembly could, by a simultaneous or subsequent act, have made a detailed application of the money borrowed on the bonds issued by the act in question, and, while the propriety of the application might have been a question, the validity of the original act thus explained would hardly have been assailed by the most litigious mind. But that is a question resting with the legislative body, and not the judicial, and the public must not be made to suffer for what thus rests on discretion, and may be done after as well as before or together with the transaction out of which the contract arises.

For the reasons thus briefly and imperfectly presented, I dissent on the points indicated.

As regards the legal effect of the consolidation act, as a compromise or otherwise, I make no comment, since it has not been in that light discussed by the majority of the court. Nor do I discuss the effect of the various acts which are alleged as acquiescence on the part of the state, reserving to myself the right hereafter to express my views on these points, if, after further reflection, I should deem it necessary or proper.

Judgment set aside.